### In re the MARRIAGE OF Kelly R. GENSLEY and Kandi J. Gensley.

**Upon the Petition of Kelly Raymond Gensley, Petitioner–Appellant/Cross–Appellee,**

**And Concerning Kandi Jean Gensley, Respondent–Appellee/Cross–Appellant.**

No. 09–0072.

Court of Appeals of Iowa.

Dec. 17, 2009.

Theodore F. Sporer and Meghan S. Hanson of Sporer & Flanagan, P.C., Des Moines, for appellant.

Crystal L. Usher of Nazette, Marner, Nathanson & Shea, L.L.P., Cedar Rapids, for appellee.

Heard by VOGEL, P.J., and DOYLE and MANSFIELD, JJ.

VOGEL, P.J.

Kelly Gensley appeals and Kandi Gensley cross-appeals from the decree dissolving their marriage. Kelly challenges the child custody and visitation provisions of the decree, as well as the provision regarding the children's health and dental insurance, the award of the marital residence to Kandi, the personal property division, and the equalization payment Kandi was ordered to pay him. On cross-appeal, Kandi challenges the provision regarding visitation. We modify the visitation provision and affirm.

## I. BACKGROUND FACTS AND PROCEEDINGS.

Kelly and Kandi were married on August 15, 1992. Their marriage resulted in three children: Kelsi (born 1994), Kodi (born 1996), and Kortni (born 2000).

The parties separated on May 25, 2006. Kandi remained in the marital residence with the children and Kelly moved to his mother's house, approximately thirty miles from the marital residence. On that same date, Kandi applied for and was granted a temporary order of protection. On June 1, 2006, a hearing was held and the district court entered an order of protection, which expired in one year, stating that both parties consented to the order. The order also granted Kandi temporary physical care of the children with Kelly having visitation, and ordered Kelly to pay temporary child and spousal support. On June 7, 2006, the district court amended the order of protection with additional terms that were agreed upon by the parties.

On June 30, 2006, Kelly filed a petition for dissolution of marriage, requesting joint legal custody and physical care of the children. On July 6, 2006, another hearing to modify the order of protection was held and the district court amended the order to specify that Kelly's visitation with the children would be every Monday and Wednesday from 4:00 p.m. to 8:00 p.m. and alternating weekends from Friday at 5:00 p.m. to Sunday at 5:00 p.m. The following day Kelly filed an application requesting temporary custody of the children in the dissolution action. On July 25, 2006, Kandi answered the petition for dissolution, in which she requested the parties be granted joint legal custody and she be granted physical care of the children. She also resisted Kelly's petition for temporary custody because it had already been determined in the order of protection. On September 14, 2006, a hearing was held on temporary matters. In its subsequent order, the district court stated:

The parties have filed a large number of affidavits, apparently again confusing the concepts of quantity and quality. Respondent has filed 20 affidavits and the petitioner has filed 33. I have read all of the affidavits and note that very few of them contain information helpful to the Court, though they appear to clearly draw the battle lines in what the parties expect and perhaps hope will be a long and protracted fight leading to the defeat of the opposing party, though inevitably with substantial "collateral damage" to the children.

The district court found that the provisions of the order of protection relating to custody, visitation, and support were incorpo-

rated by reference and ordered that they be followed.

On November 9, 2006, Kelly was found to be in contempt for violating the order of protection and was sentenced to twenty-four hours in jail. In November and December 2006, Kelly and Kandi attended individual and joint counseling sessions with a family therapist, Dr. Elisabeth M. Robbins. A letter written by Dr. Robbins dated January 5, 2007, was filed with the district court. Dr. Robbins reported that

The high defensiveness and frequent accusations [that] characterize this couple appear to be the result of years of accumulated anger and hurts they have received from the other and which they have never been able to talk out and resolve. It will take a good deal of time, and recognition from both parties of their personal responsibility in contributing to today's situation, before their relationship can be healed.

She also reported the parties' highly-conflicted relationship could result in long term emotional damage to their children.

On July 26, 2007, Kelly filed an application to modify the temporary order. A hearing was held on August 30, 2007, and the district court found there had not been a substantial change in circumstances since the court's October 5, 2006 order.

On September 18, 2007, Kelly filed an application to inventory the household contents and equipment located at the marital home. Kandi filed a partial resistance. On November 1, 2007, a hearing was held and the district court ordered for an inventory of the household contents and equipment to be held on November 17, 2007. Additionally, the district court stated that it intended to appoint an attorney to repre-

sent the parties' children and ordered the parties to mutually agree on an attorney and submit the attorney's name to the court. On December 27, 2007, the district court appointed Maurine Braddock to represent the children's interests.[1]

On January 10, 2008, Braddock filed a motion for an emergency hearing and the appointment of an expert. Braddock reported that she met with Kandi, Kelly, and the children. She stated that "[t]he children have clearly been affected by the adversarial actions of the parties," "both parties have made efforts to involve the children in this dissolution case, which [has] been harmful to the children," and expressed "concern that there have been deliberate efforts to alienate the children from the parents." Braddock reported that she discussed her concerns with both parties' attorneys, after which Kelly confronted Kelsi and refused to allow her to speak with Kandi or participate in extracurricular activities that night. Braddock stated that the children needed to be protected from such future conduct and requested that an expert be appointed to evaluate the parties and the children and make recommendations concerning custody and visitation. On January 16, 2008, a hearing was held. The district court found that neither of the parties resisted the appointment of an expert. Braddock was instructed to find an expert and if neither of the parties objected to the expert, submit the proposed expert's name to the district court for approval. Additionally, the district court found the children's attorney "raised valid concerns about the conduct of [Kelly] in some of his communications with the children." The district court ordered the parent having physical care of or visitation with the children

1. Braddock was appointed as the children's attorney, but throughout the proceedings Braddock was interchangeably referred to as the children's attorney and the children's guardian ad litem.

"shall be responsible for making certain that the children attend all of their regular scheduled activities during the time the children are with that parent." Further, the parties were ordered not to discuss the pending dissolution action with the children and ordered not to use the children to convey messages from one party to the other.

On January 18, 2008, Kelly filed a motion to modify temporary child and spousal support and to establish a health insurance obligation. The company that Kelly had been employed by was filing for bankruptcy protection and Kelly had become unemployed. Following a hearing, the district court modified the temporary child support and terminated the temporary spousal support.[2] Kandi was ordered to provide health insurance for the children. Additionally, both parties were enjoined from unilateral disposition of assets and were "encouraged to cooperate and amicably resolve without further court involvement any disputes or disposition of personal property, including [Kelly's] tools."

On January 28, 2008, Braddock filed an application requesting the district court appoint an expert because Kelly would not consent to the only expert she could find in the area willing to "undertake this case." On February 6, 2008, another hearing was held and the district court found that although Kelly had previously objected to the specific expert, "[b]oth parents now stipulate to the appointment of Lou Blankenburg to evaluate the parties and the children and make recommendations concerning custody and visitation."

Numerous filings continued, including applications for rule to show cause, a motion to compel regarding discovery, and a motion to modify temporary child support.[3] Additionally, prior to trial Kandi requested, and was later granted, leave to amend her answer to request sole legal custody and physical care of the children.

Trial was held July 21–23, 2008. At the time of trial, both parties were forty-four years old. Prior to the marriage, Kelly had obtained an Associate of Science degree in tool and die making. Throughout the marriage he had been employed by Victor's Plastics. The last position he held in the company was as a senior designer and purchasing agent, at which he earned twenty-five dollars per hour. As of January 24, 2008, Kelly was unemployed. After his employment ended, Kelly completed a twelve to thirteen week training program. He received unemployment benefits and earned income from odd-jobs, but testified that his goal was to be self-employed in product and tooling design and anticipated his income would be similar to that which he had at Victor's Plastics. Kelly remained living with his mother at the time of trial.

2. The hearing was held on February 1, 2008.

3. On February 15, 2008, Kelly filed a motion to compel regarding discovery, to which Kandi responded that she had provided initial and supplementary discovery responses. Kelly later withdrew this motion on April 10, 2008. On February 25, 2008, the children's attorney filed an application for rule to show cause alleging that Kelly had violated the district court's order by failing to take the children to their activities and discussing the pending dissolution and financial matters with the children. On April 3, 2008, Kelly filed another motion to modify temporary child support. On April 10, 2008, Kandi filed an application for order to show cause stating that Kelly had failed to pay the fees ordered for payment of an expert and for child support. Kandi withdrew this application after Kelly made the payments on May 28, 2008. On June 9, 2008, Kelly filed an application for order for rule to show cause, alleging that Kandi was in contempt because he did not have visitation with Kelsi during a weekend scheduled in May.

Prior to the marriage, Kandi had earned a Bachelor of Arts degree in accounting from the University of Northern Iowa. At the beginning of the marriage she was employed by Mercy Hospital in Cedar Rapids as the budget director. After Kodi was born, she continued working for Mercy Hospital but moved to a part-time position as a staff accountant. Additionally, during the marriage she was an Avon consultant and at the time of trial was a Tastefully Simple consultant.

Both parties testified as to the high degree of difficulty they had communicating with each other. Kandi testified that after the first year-and-one-half to two years of marriage, Kelly began exhibiting abusive behavior. Two specific instances in May 2006 prompted her to file for an order of protection. The parties attempted to reconcile from May to August 2007, and after the attempt failed, Kandi testified that Kelly continued to harass and intimidate her. There were several incidents where Kelly reported Kandi to the Sheriff's Office for animal neglect and to the Iowa Department of Human Services and Sheriff's Office for child abuse, all of which were unfounded. Kelly testified that there had been communication problems in their marriage that lasted through the date of the trial. When questioned about why he and Kandi filed separate income tax returns since 1999 or 2001, Kelly responded that it was as a result of communication problems.[4] When asked whether he and Kandi had been "civil toward each other in memorable history," he responded that they had been "in our early years of marriage." Finally, Kelly stated there was an "intense hostility" between him and Kandi.

Kelly requested joint legal custody and that Kandi have physical care of Kelsi, he have physical care of Kodi, and they share physical care of Kortni. As for scheduling, he proposed that Kodi remain with him except for spending Tuesday and Wednesday nights with Kandi. Since the children began school, they had attended a private school, Lutheran Interparish School, which offered classes for kindergarten through eighth grade. Kelsi was entering ninth grade the month following trial at Williamsburg Public Schools. Kelly requested Kodi and Kortni switch to public schools. Kandi requested sole legal custody and physical care of the children. She wanted the children to continue attending their current church and Kodi and Kortni to continue attending their private school.

Braddock, the children's attorney, recommended that Kandi be granted sole legal custody and physical care and Kelly be granted visitation. Blankenburg, the child custody evaluator, made the same recommendation. Blankenburg described "the level of animosity between [Kelly and Kandi as] unusual." When asked to describe the family, she stated that there was "a considerable amount of anger between the parents that affect the children" and the "protracted animosity [ ] has done a lot of damage to the children." She further testified:

Q. [P]lease tell the Court your observations about whether each parent would be a suitable custodian for the children? A. In my observation, Kandi is able to consider the children's needs and to provide resources to have their needs met and to manage her emotions well enough to implement those things for the children. In my observations, I think Kelly cares for the children, but is

4. The record included Kandi's income tax returns from 2001 to 2007 and Kelly's income tax returns from 2001 to 2006. The parties filed separate federal income tax returns in all years except 2006.

so angry about the situation that he finds himself in that anger, [which] interferes with his ability to take care of the children at some level.

... A. I think that Kandi is affected by the divorce that she's going through, but that she has a sense of needing to—to do—provide care to her children and do her motherly duties that they can rely on, so that she's able to be consistent in terms of providing for the children's needs even though she's very upset. I think Kelly is—I've seen him repeatedly return to focusing more on his anger with Kandi than on thinking through the children's needs, and so that concerns me.... [H]e is, for whatever reason, at this time more focused on himself and his needs than the children's, although I think he cares for the children.

. . .

Q. What have you observed about the ability of each parent to communicate with the other parent regarding the children's needs? A. I'd say that—that communication between the two parents is poor, and that each parent has difficulties. Kandi, however, is able to continue trying to get business done, even though she gets upset with Kelly, and Kelly especially resorts to accusing Kandi of making problems and wanting to keep the children from him.

. . .

Q. What have you observed to the degree to which each parent can support the other parent's relationship with the children? A. I've noticed that Kandi, in spite of her feelings about Kelly, seems to understand that the children's relationship with him is important, and that she encourages that. And that Kelly is so angry at Kandi that he seems to discourage the children thinking well of their mother.

. . .

Q. What is your understanding of each of the parents' views on custody? A. My impression is that Kandi wants to have sole custody so that there is less interaction between her and Kelly around making decisions for the children, but that she wants the children to have adequate visitation with Kelly so that they can have a good relationship with their father. And that Kelly seems to resent any relationship that Kandi has with the children.

. . .

Q. So do you think that it would be better to divide these children up or keep them together predominantly in one home? A.... I think it would be better to keep them together in many ways ...

Q. Okay. What are the potential harmful effects of splitting children up? A. They have a deep sense of loss. They feel that they—in the long run, they're likely to either feel that they were inadequate in some way, and so they—this destructive thing happened to their family, so they're likely to feel angry and act out a lot of anger or both. And they're likely to have more difficulty forming relationships with other people in adult life, and even have more difficulty in work and maintaining their health.

... A.... [I]t would be preferable for them actually to not have to interact more than the bare minimum that it takes to exchange the children. And that I think the children will feel closer to both of them if the parents argue less and have less to argue about.

... there will be less discord between them than if there would be if they had joint legal custody.

Finally, along with several other witnesses, Kelsi and Kodi also testified. Kelsi reported that she was upset with her father and had refused to see him for his scheduled visitation since mid-May. Kodi reported that he preferred to live with Kelly.

Following trial and pending the district court's decree, the discord and litigation between the parties continued.[5] On August 6, 2008, Braddock filed an application for order for rule to show cause stating that Kelly was not taking the children to their activities and failed to return Kodi and Kortni to Kandi's care following visitation on August 4. On August 9, 2008, Braddock amended her application stating that after visitation on August 4, Kelly did not return Kodi and Kortni to Kandi's care and although Kelly returned Kortni on August 6, he had not yet returned Kodi. On August 27, 2008, Braddock again amended her application stating that Kelly still had not returned Kodi to Kandi's care, had not been taking Kodi to his counseling appointments and many of his activities, and had removed Kodi from the private school he attended and enrolled him in the public school without the knowledge or consent of Kandi. A hearing was held, during which Kodi testified outside of the presence of both his parents. On September 15, 2008, the district court found that the temporary order had been in effect for two years and was clear and unambiguous as to Kelly's obligation to return the children to Kandi's care on August 4 at 8:00 p.m. The district court discussed Kelly's failure to return Kodi to Kandi's care, stating in part,

> The Court finds that Kelly has not EVER ... encouraged Kodi to return to his mother's care Kelly stated he has done all that he could to abide by the Court Orders. To be kind, Kelly's testimony can only be countenanced in a "nod, nod, wink, wink" category. Kelly has intentionally placed his twelve-year-old son in the completely untenable position of having to publicly choose between his parents, has deprived Kodi of his mother's love and attention (and vice versa) thereby potentially causing significant emotional harm to Kodi, has obviously orchestrated at least a portion of Kodi's resentment toward his mother, and has enthusiastically allowed the "tail to wag the dog." Having done all the above, he chooses to lay the blame for the violation of the Court Orders on this twelve-year-old son's shoulders. He has inappropriately conveyed to Kodi that he need not return to his mother's care until he wants to; that the choice is somehow his.... The Court finds that it has been established beyond any reasonable doubt that Kelly has intentionally and repeatedly violated known Court Orders regarding the custody, schooling, and visitation with respect to Kodi, and that Kelly has established no legal excuse for his failure to comply with Court Orders.

The district court found Kelly was in contempt of court for his failure to timely return Kortni to Kandi's care and his failure to return Kodi at all and sentenced him to serve twenty days in jail, with sixteen days suspended upon the return of Kodi to Kandi's care. On September 17, 2008, an Iowa Department of Human Services assessment found that Kelly had caused Kodi to be so distressed so as to result in mental injury.

On September 4, 2008, Kelly filed an application for order for rule to show cause

5. We discuss some of the filings that occurred after the trial, but note there were numerous others.

alleging that he had been denied visitation with Kelsi since May 23, 2008.

On September 19, 2008, Braddock, at Kelsi's request, filed an application for an order for Kelly to return Kelsi's personal property. On October 3, 2008, the district court ordered Kelly to return Kelsi's personal property, including her iPod and a new laptop computer. Additionally, the court ordered that Iowa Child Advocate Services "provide remedial in home family services, ... including a plan for immediately commencing visitation" between Kelly and Kelsi and "the Abbe Center for Community Mental Health shall provide counseling services to the parties and the children until they conclude that the family has achieved maximum benefits or further court order."

On October 30, 2008, the district court entered the dissolution decree.[6] The district court granted Kandi sole legal custody and physical care of the three children. Kelly was granted visitation and ordered to pay child support. Kandi was ordered to provide medical and dental insurance for the children and Kelly was ordered to reimburse Kandi for one-half of her out-of-pocket expense for the insurance. The district court divided the marital assets and debts. Kandi was awarded the marital home. Although the parties were awarded certain personal property items, the parties had numerous exhibits listing over 600 additional items of personal property and did not agree as to the value or distribution of these items. The district court found "it is impossible to value these items of personal property without speculating as the value of hundreds of items ... the only practical way to value these items and to provide for the disposition of

these items is to order a private auction between the parties to be conducted by the attorneys." Finally, Kandi was ordered to pay $139,000 to Kelly to equalize the distribution of assets.

Both parties appeal.

## II. SCOPE OF REVIEW.

We review the provisions of a dissolution decree de novo. Iowa R.App. P. 6.907 (2009); *In re Marriage of Hansen,* 733 N.W.2d 683, 690 (Iowa 2007); *In re Marriage of Sullins,* 715 N.W.2d 242, 247 (Iowa 2006). However, we recognize that the district court was able to listen to and observe the parties and witnesses. *In re Marriage of Zabecki,* 389 N.W.2d 396, 398 (Iowa 1986); *In re Marriage of Vrban,* 359 N.W.2d 420, 423 (Iowa 1984) ("[The district court] is greatly helped in making a wise decision about the parties by listening to them and watching them in person. En contrast, appellate courts must rely on the printed record in evaluating the evidence. We are denied the impression created by the demeanor of each and every witness as the testimony is presented."). Consequently, we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, but are not bound by them. Iowa R.App. P. 6.904(3)(*g* ); *Sullins,* 715 N.W.2d at 247 (quoting *In re Marriage of Witten,* 672 N.W.2d 768, 773 (Iowa 2003)).

## III. ANALYSIS.

### A. Child Custody.

■ Upon dissolving a marriage involving minor children, the district court must determine whether one or both parents shall have legal custody of the children.

---

6. Both parties filed a motion pursuant to Iowa Rule of Civil Procedure 1.904(2). On December 9, 2008, the district court ruled on the motions. The district court made minor modifications to the property division and visitation schedule, which is reflected in this recitation of facts.

*In re Marriage of Hynick,* 727 N.W.2d 575, 578 (Iowa 2007). "Legal custody" carries with it certain rights and responsibilities, including but not limited to "decision making affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction." Iowa Code § 598.1(3), (5) (2005). When the parents are awarded joint legal custody, both parents have "legal custodial rights and responsibilities toward the child" and "neither parent has legal custodial rights superior to those of the other parent." *Id.* § 598.1(3).

The children's best interests are the primary concern in determining a legal custody award. Iowa R.App. P. 6.904(3)(*o* ); Iowa Code § 598.41. The district court shall make an award that, so long as reasonable and in the best interests of the children, assures the children the "opportunity for the maximum continuing physical and emotional contact with both parents." Iowa Code § 598.41(1)(a). Similarly, the district court "shall consider the denial by one parent of the [children's] opportunity for maximum continuing contact with the other parent, without just cause, a significant factor in determining the proper custody arrangement." *Id.* § 598.41(1)(c); *see In re Marriage of Bolin,* 336 N.W.2d 441, 446 (Iowa 1983) ("When one parent's obduracy makes joint custody unworkable, the trial court in a modification proceeding may find the child's best interests require sole custody in the other parent."). In determining whether joint legal custody is in the best interests of the minor children, the court must consider several factors:

a. Whether each parent would be a suitable custodian for the child.

b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.

c. Whether the parents can communicate with each other regarding the child's needs.

d. Whether both parents have actively cared for the child before and since the separation.

e. Whether each parent can support the other parent's relationship with the child.

f. Whether the custody arrangement is in accord with the child's wishes or whether the child has strong opposition, taking into consideration the child's age and maturity.

g. Whether one or both the parents agree or are opposed to joint custody.

h. The geographic proximity of the parents.

i. Whether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation.

j. Whether a history of domestic abuse, as defined in section 236.2, exists . . . .

Iowa Code § 598.41(3). If the district court does not grant joint legal custody, the court must cite clear and convincing evidence, according to the enumerated factors listed above, that joint legal custody is unreasonable and not in the children's best interests "to the extent that the legal custodial relationship between the child and a parent should be severed." *Id.* § 598.41(2)(b).

■ Kelly argues the district court failed to cite clear and convincing evidence joint legal custody was not in the best interests of the children. In making the decision to grant Kandi sole legal custody, the district court discussed the factors

enumerated in Iowa Code section 598.41(3):

> Both parents love the children and have bonded with the children. Both parents would be a suitable custodian for the children, although Kelly would have to make some changes in the way he deals with Kelsi. The psychological and emotional needs and development of Kelsi and Kortni will not suffer if there is a lack of active contact with and attention from Kelly. The psychological and emotional needs and development of Kodi will suffer if there is a lack of active contact with and attention from both parents. The parents are unable to communicate with each other regarding the children's needs. The breakdown of communication between Kelly and Kandi is very serious and protracted. Both parents have actively cared for all three children before the separation. Since the separation, both parents have actively cared for the children, but Kandi's care for Kelsi and Kortni has been substantially greater than Kelly's. Kandi can support Kelly's relationship with all three children. Kelly has been unable to support Kandi's relationship with Kodi and Kelsi and has attempted to undermine Kandi's relationship with both of these children, particularly Kodi. Kodi prefers to be in his father's primary physical care and, therefore, a placement of Kodi in Kandi's care would be against Kodi's wishes. Although Kodi appears to be adamant in his views, it is highly likely that once the decision is made by the Court and the pressure is taken off Kodi, he will be able to successfully adapt. However, Kodi's ability to adapt would be dependent upon Kelly's support.
>
> Kandi is strongly opposed to joint legal custody for the reason that the parties have been unable to successfully communicate with each other.... Although there is one documented incident of domestic abuse that occurred in 2006, I conclude that there is not a history of domestic abuse for the reason that the prior incidents alleged by Kandi are very remote. However, there is a long history of verbal abuse, as distinguished from domestic abuse, which has been inflicted by Kelly upon Kandi. After considering all of these factors, I find that Kandi has proven by clear and convincing evidence that joint custody is unreasonable and not in the best interest of the children to the extent that the legal custodial relationship between all three children and Kelly should be severed.

The district court then granted Kandi's request to have sole legal custody.

We agree with the district court that consideration of the statutory factors weighs against joint legal custody. The overriding factor weighing against joint legal custody is the parties' utter inability to communicate with each other, which is a result of their toxic relationship. "Although cooperation and communication are essential in joint custody, tension between the parents is not alone sufficient to demonstrate it will not work." *Bolin,* 336 N.W.2d at 446; *see In re Marriage of Stafford,* 386 N.W.2d 118, 121 (Iowa Ct. App.1986); *In re Marriage of Ertmann,* 376 N.W.2d 918, 920 (Iowa Ct.App.1985). The parties' inability to communicate and cooperate must rise above the "usual acrimony that accompanies a divorce." *Ertmann,* 376 N.W.2d at 920. In this case, the district court concluded, and we agree, Kelly and Kandi's communication problems are so protracted that they exceed "the usual acrimony that accompanies a divorce." *See id.*

Both the parties agreed their relationship was "hostile." In fact, when asked

whether Kelly could remember a time they had been civil to one another, he responded that it was at the beginning of their marriage. *See Bolin,* 336 N.W.2d at 446 ("Even though the parents are not required to be friends, they owe it to the child to maintain an attitude of civility, act decently toward one another, and communicate openly with each other. One might well question the suitability as custodian of any parent unable to meet these minimum requirements."). Witnesses for both parties testified to abusive or inappropriate incidents they had witnessed throughout the marriage. This was confirmed by Dr. Robbins who reported that Kelly and Kandi's communication problems are long-standing.

Throughout the proceedings, the parties have had intense disagreements over the church and school the children would attend and the extracurricular activities the children would participate in. Even though the parties disagree on such matters, these problems should be able to be resolved to the benefit of the children. *See Ertmann,* 376 N.W.2d at 920–21 (discussing that although the parties had some difficulty communicating, they gave priority to their child's welfare and would be able to communicate adequately regarding her needs). However, in this case, the parents' inability to work toward solutions has thrust confusion and emotional upheaval on the children, often bringing their daily lives to a standstill amidst the warring climate of their parents' discord. The protracted court filings provide additional proof of the inability of these parents to share legal custody of the children. With an award of sole legal custody, one parent will make the decisions, which will ensure the decisions are made and result in a more stable atmosphere for the children to carry on with their daily lives.

Both the children's attorney and the family counselor, Blankenburg, recommended sole legal custody due to the severe communication problems. Blankenburg testified "the level of animosity between [Kelly and Kandi] was unusual" and the "protracted animosity has done . . . a lot of damage to the children." Due to the "notably difficult" situation between Kelly and Kandi, she recommended they interact no more than necessary to exchange the children. We agree with the district court that Kelly and Kandi have "extreme difficulty communicating" and there is "intense hostility" between the parties, and most importantly "[t]he relationship between Kelly and Kandi is dysfunctional to the extreme level that it is negatively impacting the children."

Another important factor the district court considered is Kelly's inability to support the children's relationship with Kandi. Evidence demonstrated that while with Kelly in a public setting, Kelsi and Kodi were reluctant to acknowledge Kandi or any member of her family, to the point of avoiding eye contact or personal contact. Blankenburg testified that Kelly "discourage[s] the children thinking well of their mother" and "seems to resent any relationship that Kandi has with the children." She reported that Kelly's extreme anger prevents him from focusing on the children's needs, whereas Kandi understood the importance of and encouraged the children's relationship with Kelly. Further, the district court found,

> [Kelly and Kandi] have had a stormy marriage, and Kelly, in particular, has been unable to put aside his past strong differences with Kandi. Kelly has failed to show respect for Kandi and is not supportive of Kandi's relationship with the children. Kandi has demonstrated support for Kelly's relationship with the children.

*See In re Marriage of Will*, 489 N.W.2d 394, 399 (Iowa 1992) (stating the denial by one parent of the child's opportunity to have meaningful contact with the other parent is a significant factor in determining custody or physical care).

We defer to the district court's credibility assessments of the parties, including sensing the level of hostility that appeared to hinder decision making in regard to the children and conclude the district court's factual findings were fully supported by the record. The district court considered all the appropriate factors in making an award of sole legal custody. We agree with the district court that this is one of the rare cases where sole legal custody is appropriate and in the best interests of the children.[7]

## B. Visibility.

■ Upon awarding one parent physical care, the district court shall award the other parent visitation that assures the children "the opportunity for the maximum continuing physical and emotional contact with both parents." Iowa Code § 598.41(1)(a). The district court granted Kelly visitation every Tuesday and Thursday evening from after school until 8:00 p.m.; every other weekend from Friday after school or at 4:30 p.m. until Sunday at 7:00 p.m.; alternating holidays; alternating no school, conference, and snow days from 7:00 a.m. to 5:00 p.m.; and three weeks in the summer, in uninterrupted one and two week periods.

On appeal, both parties argue the visitation should be modified. Kelly requests that (1) he be awarded visitation overnight on Tuesdays; (2) weekend visitation be extended from the end of the school day on Friday until the commencement of the school day on Monday; (3) all weekend holiday visits, except Christmas, begin on the Friday prior to the holiday and terminate on the Monday following the holiday; (4) all "no school" and "early release" visitation, regardless of the reason school is not in session, be from 8:00 a.m. until the resumption of school; and (5) he be awarded six weeks of visitation during the summer, divided into two three-week periods. Kandi asserts that visitation should be modified to (1) eliminate one weeknight visit; (2) eliminate the "no school day" provision; and (3) change Sunday visits to end at 4:30 p.m.[8] The district court considered arguments regarding the visitation schedule pursuant to the parties' post-trial Iowa Rule of Civil Procedure 1.904(2) motions and made some modifications to the visitation schedule.

---

7. After determining legal custody, the district court made additional findings to support the physical care placement with Kandi. *See* Iowa Code § 598.41(3); *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974) (providing nonexclusive factors for the district court to consider in a physical care determination). On appeal Kelly contends he should have been granted physical care of Kodi and he and Kandi should have shared physical care of Kortni. We note that Blankenburg testified splitting up the children would be detrimental to them. *See In re Marriage of Smiley*, 518 N.W.2d 376, 380 (Iowa 1994) ("Siblings should not be separated from one another without good and compelling reasons."); *Will*, 489 N.W.2d at 398 (there is a presumption that siblings should not be sepa-

rated in the absence of good and compelling reasons). Because we affirm the district court's award of sole legal custody to Kandi, we do not need to address this issue. *See* Iowa Code § 598.41(5)(a) (stating that upon an award of *joint legal custody*, the district court may consider joint physical care).

8. Additionally, Kandi requests that the visitation schedule be modified to eliminate one week of Kelly's summer visitation, but also requests the visitation schedule be modified to "equalize the summer vacation time with each party." It is unclear what exactly Kandi is requesting, but regardless we decline to change the summer visitation schedule.

Overall, we find the visitation schedule serves the best interests of the children, allowing them to have time with each parent, but modify in one respect. Kandi argues that one weeknight visitation should be eliminated due to the difficulty of implementing it during the school year. It appears that on school nights, the children have difficulty completing their homework and going to bed at their normal time when also shuffling back and forth between the two homes. We agree that in this case, where there is great acrimony between the parents and there has been difficulty implementing visits on school nights without the children's homework or sleep being compromised, one weeknight visit should be eliminated. We modify the visitation schedule to eliminate the Thursday evening visit during the school year. Otherwise, we find the visitation schedule is reasonable and decline to make further changes.

### C. Counseling Issue.

■ After trial but before the district court entered the dissolution decree, both parties alleged the other was in contempt of the temporary orders. On October 3, 2006, following a hearing (before another district court judge) on Kelly's petition asserting that Kandi was in contempt because he had not had visitation with Kelsi since May, the district court ordered, in part, that:

Independent Child Advocate Services (ICAS) provide remedial in home family services deemed appropriate by ICAS for the family, including a plan for immediately commencing visitation between Kelsi and Kelly. Each party shall pay one-half of any costs related for such family services and shall comply with the recommendations of ICAS with respect to visitation. As long as the parties are in compliance with the recommmendations of ICAS, neither shall be

considered in contempt.... The Abbe Center for Community Mental Health shall provide counseling services to the parties and the children until they conclude that the family has achieved maximum benefits or until further Court order.... By agreement of the parties this Agreement and Order shall be deemed to survive the entry of the pending Decree of Dissolution of Marriage.

On October 30, 2008, the dissolution decree provided, in part:

Counseling: The parties and the children shall continue in counseling with Lou Blankenburg and/or other professionals who she designates until such time as those professionals send a letter to the Clerk of Court indicating that all parties have achieved the maximum benefits of counseling. The counselors shall have the discretion to authorize visitation in addition to the minimum specified above.

On appeal, the parties disagree as to which provision prevails. Kelly asserts the contempt order should prevail and Kandi asserts the dissolution decree should control. However, because neither party raised this issue in either post-trial motion pursuant to Iowa Rule of Civil Procedure 1.904(2), error was not preserved on this issue. *See Meier v. Senecaut,* 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal. When a district court fails to rule on an issue properly raised by a party, the party who raised the issue must file a motion requesting a ruling in order to preserve error for appeal."); *State Farm Mut. Auto. Ins. Co. v. Pflibsen,* 350 N.W.2d 202, 206 (Iowa 1984) ("It is well settled that an [Iowa Rule of Civil Procedure 1.904(2) ]

motion is essential to preservation of error when a trial court fails to resolve an issue, claim, defense, or legal theory properly submitted to it for adjudication."). Additionally, had it been preserved, both parties waived the issue on appeal because they did not cite to any legal authority supporting their positions. Iowa R.App. P. 6.14(1)(c). Nevertheless, the district court had the entire file before it in entering its ruling. We find the contempt order was an interim order, which was superseded by the entry of the final decree and therefore, the final decree controls.

### D. Health Insurance.

■ The district court ordered for Kandi to provide health and dental insurance for the children and for Kelly to reimburse Kandi for one-half of her out-of-pocket cost for the premium. Both parties have approximately equal earning capacities, with Kelly at $52,000 and Kandi at $49,999. Kandi has health and dental insurance available through her employment. On appeal, Kelly argues that Kandi may have been given a "double recovery by deducting the cost of Kandi's health insurance from her gross income without crediting Kelly's reimbursement for half that amount."

Kelly did not raise his concerns before the district court and hence, there is nothing in the district court ruling to shed any light on this issue. Moreover, Kelly did not raise this issue in his post-trial motion pursuant to Iowa Rule of Civil Procedure 1.904(2). The difficulty presented on appeal is that the child support worksheets are not included in the record and therefore, there is no support in the record for Kelly's argument, nor information provided for our review. Therefore, we decline to address the issue.

### E. Marital Residence.

■ Iowa law requires that marital property be divided equitably between the parties. Iowa Code § 598.21(5). Iowa courts do not require an equal division or percentage distribution. *In re Marriage of Campbell,* 623 N.W.2d 585, 586 (Iowa Ct.App.2001). The determining factor is what is fair and equitable in each particular circumstance. *In re Marriage of Miller,* 552 N.W.2d 460, 463 (Iowa Ct.App. 1996). Iowa Code section 598.21(5) sets forth the factors to consider in an equitable distribution. One of these factors is:

> The desirability of awarding the family home or the right to live in the family home for a reasonable period to the party having custody of the children, or if the parties have joint legal custody, to the party having physical care of the children.

Iowa Code § 598.21(5)(g); *see In re Marriage of Ales,* 592 N.W.2d 698, 704 (Iowa Ct.App.1999) ("We believe that provisions which allow the primary physical care parent to remain in the family home are primarily made to provide stability for the children; the economic benefit to the parent is ancillary.").

In 1998–1999, Kelly and Kandi built a home on twenty-seven acres and moved into it in May 1999. Kelly asserts he should have been awarded the marital residence because although they built the home together, he did most of the work and can make better use of the property. Kandi replies that they both worked on the home and she also enjoys the home and uses the acreage. We agree with the district court's decision to award the marital home to Kandi. The home is a marital asset and both parties are deemed to have contributed equally to the accumulation of marital assets, although not necessarily in the same fashion. *Miller,* 552 N.W.2d at 465 (discussing that we do not focus on a

party's direct contribution to an increase in an asset, but "we broadly consider the contributions of each party to the overall marriage"); *In re Marriage of Russell,* 473 N.W.2d 244, 246 (Iowa Ct.App.1991) ("The partners in a marriage are 'entitled to a just and equitable share of the property accumulated through their joint efforts.' "). Additionally, Kandi was granted physical care of the children, who stated they wish to remain in the only home they have essentially ever known. *See* Iowa Code § 598.21(5)(g). We affirm the district court's award of the marital residence to Kandi.

### F. Personal Property.

■ Although the district court divided some items of personal property, the parties had numerous exhibits listing over 600 additional personal property items and did not agree as to the value or distribution of these items. The district court found

> [I]t is impossible to value these items of personal property without speculating as to the value of hundreds of items ... the only practical way to value these items and to provide for the disposition of these items is to order a private auction between the parties to be conducted by the attorneys.

Therefore, the district court ordered a private auction between the parties with their respective attorneys presiding. Any inequity in the total amount of items bid on and received by the parties shall be resolved by having the one whose bid totals are greater pay the other party one-half of the difference in their bid totals.

On appeal, both parties assert that the district court should have divided the personal property according to their separate inventories and object to the auction as "unworkable." Other than the parties' differing assertions of the value of these items, the district court did not have reliable evidence upon which to value the items. The testimony demonstrated that several items listed on the parties' inventories had been disposed of by the parties years ago. We affirm the district court's remedy as being both practical and equitable under the evidence presented. Additionally, the parties should not expect the court to appreciate the personal nor sentimental value of certain items to the parties. They would likely not be content with any resolution made by the court. It is not a wise use of judicial resources to list every piece of property once owned by the parties and expect the district court to wade through the lists to determine the value of each item.

### G. Equalization Payment from Kandi to Kelly.

■ Finally, Kelly argues the district court did not value many assets and liabilities correctly, including the value of the "sweat equity" he put into the marital residence, and as a result the equalization payment from Kandi to Kelly should be increased. The parties' valuations differed greatly and the district court made certain credibility determinations as to the value of some items. There is support for the district court's valuations and the values assigned to the property were within the permissible range of evidence. *See Hansen,* 733 N.W.2d at 703 ("A trial court's valuation of an asset will not be disturbed when it is within the permissible range of evidence."). The district court demonstrated fairness in determining the value of the marital property and divided it as equitably as possible under the record established at trial. Therefore we affirm the valuation and division of property, with the resulting equalization amount for Kandi to pay to Kelly.

## IV. CONCLUSION.

We affirm the district court's decree of dissolution of marriage, but modify the visitation provision by eliminating one weeknight visitation during the school year. Costs on appeal are assessed one-half to each party.[9]

**AFFIRMED AS MODIFIED.**

9. Kandi requested appellate attorney fees for the first time at oral argument. We decline any award of appellate attorney fees.