# IN THE COURT OF APPEALS OF IOWA

No. 23-1224
Filed October 30, 2024

IN RE THE MARRIAGE OF MOLLY G. ANDERSON
AND NICHOLAS J. ANDERSON

Upon the Petition of
**MOLLY G. ANDERSON,**
        Petitioner-Appellee,

**And Concerning**
**NICHOLAS J. ANDERSON,**
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Mills County, Greg W. Steensland,

Judge.


        The husband appeals the decree dissolving his marriage.  **AFFIRMED.**


        Meredith L. Ludens and Andrew B. Howie of Shindler, Anderson, Goplerud

& Weese, P.C., West Des Moines, for appellant.

        DeShawne L. Bird-Sell of Sell Law, PLC, Glenwood, for appellee.


        Heard by Greer, P.J., Buller, J., and Gamble, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2024).

**GREER, Presiding Judge.**

Nicholas Anderson challenges the decree dissolving his marriage to Molly Anderson.  He argues (1) the parties premarital agreement was valid and should have been enforced; (2) the parties should have been awarded joint legal custody instead of giving Molly sole legal custody; (3) the children should have been placed in his physical care instead of Molly's; (4) the district court abused its discretion in ordering him to pay Molly's attorney fees and, instead, should have ordered Molly to pay his attorney fees; and (5) Molly should be required to pay his appellate attorney fees.  Molly asks that we affirm the dissolution decree and award her appellate attorney fees.

**I. Background Facts and Proceedings.**

Molly and Nicholas met while both were living in Florida.  They entered into a premarital agreement on August 12, 2016, and were married eight days later.  The parties' first child, J.A., was born in early 2020.

The family of three moved to Iowa in October 2020, where Nicholas's parents and some of his other family members lived.  Z.A., the parties' second child, was born mid-2021.

Molly took the children and moved out of the family home in July 2022.  She filed a petition for dissolution soon after.

After much contentious litigation, a three-day dissolution trial took place beginning March 15, 2023, and ending on May 4.  By the time of the final day of trial, Nicholas was living in Florida, where he moved after accepting a new job.  Molly, who had physical care of the children under temporary orders, was in the process of moving to Maryland with the children.  Each parent requested physical

care, while Molly asked for sole legal custody and Nicholas requested the parties share joint legal custody.

In the dissolution decree, the district court concluded the premarital agreement was unenforceable. The court ordered Nicholas to pay Molly $56,000 as part of the property division. As for the issues involving the children, the court gave Molly sole legal custody and physical care of the children; Nicholas was given visitation time over school breaks. Finally, Nicholas was ordered to pay $30,000 of Molly's attorney fees "[d]ue to the needlessly protracted nature of these proceedings, the failure to timely provide required discovery, including exhibits, and the relative ability of the parties to pay."

Nicholas appeals.

## II. Discussion.

### A. Premarital Agreement.

Nicholas challenges the district court's ruling that the parties' premarital agreement is unenforceable. Yet, he makes no argument how enforcement of the agreement would result in a different property distribution and—admitting that he cannot make that showing on this record—he requests that we remand the case so he can address the division in additional proceedings. Because a determination over whether the premarital agreement is valid and enforceable is unnecessary, we see no reason to conduct the choice-of-law analysis or determine its viability related to the issues raised on appeal.[1]

---

[1] Nicholas spends much of his appellate brief arguing that—unlike in Iowa—Florida law allows a party to waive their right to future spousal support in a premarital agreement. The district court did not award Molly spousal support (and she did

The court ordered Nicholas to pay Molly $56,000 as part of the property distribution; he asks us to vacate this award "and remand for further proceedings to divide the parties' property by the terms of the [premarital] agreement." But Nicholas fails to identify what property, if any, the parties owned at the time of the dissolution trial that was his separate property based on the premarital agreement. *See* Iowa R. App. P. 6.904(3)(e) ("Ordinarily, the burden of proof on an issue is upon the party who would suffer loss if the issue were not established."); *In re F.W.S.*, 698 N.W.2d 134, 135 (Iowa 2005) ("It is the appellant's duty to provide a record on appeal affirmatively disclosing the alleged error relied upon."); *cf. In re Marriage of Keener*, 728 N.W.2d 188, 194–95 (Iowa 2007) (ruling on property distribution based on evidence from dissolution proceedings even though "the record lack[ed] sufficient evidence concerning a specific dollar amount to attach to the[] assets"). Without identifying what items or values were wrongly awarded to Molly or citing to record evidence that supports his claim, we would have "to assume a partisan role and undertake [Nicholas's] research and advocacy" to find fault with the district court's ruling. *See Inghram v. Dairyland Mut. Ins. Co.*, 215 N.W.2d 239, 240 (Iowa 1974). "This role is one we refuse to assume." *Id.*

As noted above, Nicholas contends we should remand the case for further proceedings regarding the division of property. The trouble is, we see no reason to allow Nicholas a second chance to prove his case. The parties had three days to try their dissolution to the district court; they introduced nearly 1000 pages of exhibits and were allowed to submit written closing arguments (of which Nicholas

---

not appeal the denial of her request). So again, we find no reason to analyze the premarital agreement's application to the issue of spousal support.

filed four). Yet on this record, we find Nicholas failed to advocate for a different division of property, even though the property division was an issue at the trial. The time has come and gone to present the necessary evidence so the property can be divided pursuant to the premarital agreement. Moreover, the district court noted Nicholas's "continuous problems with discovery and filing of pleadings and exhibits in an untimely manner" during the dissolution proceedings; we will not give him a second bite at the proverbial apple.[2] We affirm the district court's property distribution.

**B. Legal Custody.**

The district court awarded Molly sole legal custody of the parties' two children. Nicholas challenges that award, arguing the court should have awarded the parties joint legal custody instead. *Compare* Iowa Code § 598.1(5) (2022), *with id.* § 598.1(3).

"'Legal custody' carries with it certain rights and responsibilities, including, but not limited to, 'decision making affecting the child[ren]'s legal status, medical care, education, extracurricular activities, and religious instruction.'" *In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007) (quoting Iowa Code § 598.1(3), (5)). "When parties are awarded 'joint legal custody,' 'both parents have legal custodial rights and responsibilities toward the child[ren]' and 'neither parent has legal

---

[2] In the dissolution decree, the court concluded "[t]he best evidence" indicated that Nicholas should pay a property settlement of $56,000 to Molly and explicitly pointed to "the fact that exhibits were not filed timely. Even during the trial when reference was made by [Nicholas] to certain exhibits, it was discovered that those exhibits had not been filed. This made the case very difficult."

custodial rights superior to those of the other parent.'"  *Id.*  (quoting Iowa Code § 598.1(3)).

"The children's best interests are the primary concern in determining a legal custody award."  *In re Marriage of Gensley*, 777 N.W.2d 705, 714 (Iowa Ct. App. 2009).  "The district court shall make an award that, so long as reasonable and in the best interests of the children, assures the children the 'opportunity for the maximum continuing physical and emotional contact with both parents.'"  *Id.* (quoting Iowa Code § 598.41(1)(a)).  In the same vein, "[t]he court shall consider the denial by one parent of the child[ren]'s opportunity for maximum continuing contact with the other parent, without just cause, a significant factor in determining the proper custody arrangement."  Iowa Code § 598.41(1)(c).  And the court considers several statutory factors, including:

> a. Whether each parent would be a suitable custodian for the child[ren].
> b. Whether the psychological and emotional needs and development of the child[ren] will suffer due to lack of active contact with and attention from both parents.
> c. Whether the parents can communicate with each other regarding the child[ren]'s needs.
> d. Whether both parents have actively cared for the child[ren] before and since the separation.
> e. Whether each parent can support the other parent's relationship with the child[ren].
> . . . .
> g. Whether one or both of the parents agree or are opposed to joint custody.
> h. The geographic proximity of the parents.
> i. Whether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation.
> j. Whether a history of domestic abuse, as defined in section 236.2, exists.  In determining whether a history of domestic abuse exists, the court's consideration shall include but is not limited to commencement of an action pursuant to section 236.3, the issuance of a protective order against the parent or the issuance of

a court order or consent agreement pursuant to section 236.5, the issuance of an emergency order pursuant to section 236.6, the holding of a parent in contempt pursuant to section 664A.7, the response of a peace officer to the scene of alleged domestic abuse or the arrest of a parent following response to a report of alleged domestic abuse, or a conviction for domestic abuse assault pursuant to section 708.2A.

*Id.* § 598.41(3).

The parties engaged in extensive, contentious litigation from the time Molly petitioned for dissolution in August 2022 until the end of the dissolution trial in May 2023. Each party painted the other as controlling, unreasonable, and only minimally involved with the children's care. Nicholas questioned Molly's mental health, while she alleged he was addicted to prescription medicine. Noting the parties' animosity, the district court appointed a child and family investigator, who filed a report two weeks before the first day of the dissolution trial and was called as a witness. *See Id.* § 598.12B. The investigator conducted a home visit with Molly and the children on February 17; "[t]he home was clean, comfortable, and appropriate" and the children were "clean, happy, and delightful little ones." The investigator was scheduled to have a home visit with Nicholas and the children on February 18, but Nicholas cancelled, stating that the children were too sick for the investigator to come to the home. Still, the investigator met with Nicholas and Molly individually. In her report, she wrote:

> Throughout the undersigned's investigation into this matter, it is clear that there is significant tension and discord between Molly and Nicholas. Even simple parenting issues are still difficult and filled with strain months after separation and the entry of the temporary order. A complete lack of trust and respect by Nicholas towards Molly as a parent is also evident. . . .
> The undersigned fears that the tumultuous battles focusing around the children in these proceedings will not end with the entry of a dissolution decree and custody order. It seems as though, no

matter what occurs, no matter what orders the Court enters, there is a new fight waiting just around the corner, ready to be brought on by [Nicholas], much of the focus centering around these young children. This is not healthy and it is not an appropriate way to parent, especially given that these children are babies. None of this centers on these kids' best interests. The kids were placed in Molly's physical care during the pendency of these proceedings, and they are doing well. They are young. They will have illnesses, they will have injuries and mishaps. This does not make Molly a bad mother. It does, likely, make her fearful to communicate as a coparent effectively, which is obvious in conversations, correspondence and a review of the pleadings from both parties. This appears to be a one-way street from [Nicholas's] side and if things do not go that direction, there is fury and incessant rampages that are relentless. This is not good for these kids now and will not be good for them throughout the coming years.

The investigator recommended that the court award Molly sole legal custody. When asked at trial, she testified she had acted as a child custody investigator "[p]robably at least twenty" times and had only recommended giving sole legal custody one other time. In its ruling, the district court found the investigator to be "[o]ne of the most compelling witnesses in this case" and described her testimony as "compelling and corroborated."

The court also found "compelling" the testimony of Tina Casey—the former Florida neighbor of Nicholas and Molly, who was friends with both parties. Tina testified about witnessing Nicholas's "angry outbursts," pointing to an instance when Nicholas gave her a ride home and exhibited signs of road rage. She described it as "terrifying," adding:

I don't know what mindset that he has when he gets into a car, but he was up on people's bumpers, he was weaving in and out of traffic, and there was no urgency or emergency that we needed to go get home so quickly. But I said to him a couple of times, God, Nick, slow down, there's no reason for you to get me home so fast. And it was like he just turned into another person when he gets into a car, I guess.

Tina also testified an instance when she was in Molly and Nicholas's home after a day of shopping with Molly:

> There was some curtains that Molly had bought . . . .  [It was] almost like he forgot my aunt and I were standing in the living room, and he was just screaming at her about these curtains.  He told her that she had to take them down, send them back, they weren't what he wanted, and it was jarring.  Besides the word jarring, it was kind of a little bit scary.

Finally, she described "realiz[ing] Molly was in a bad situation" when she was supposed to pick Molly up one time before Molly and Nicholas moved to Iowa:

> And so she came out, and she looked like she has been crying.  And, you know, immediately because I love her like a daughter as well, motherly instincts, "Are you okay?  What happened?" . . .  And she said, "No, I'm fine."  I said, "You don't look fine.  What's wrong?"  And she said, "Nick blocked the door again and wouldn't let me out."  And I said, "Oh, hey, like maybe a romantic thing?"  "No, no.  It wasn't.  It wasn't that.  I just don't want to talk about it." . . .
> I had, like, that feeling the whole time we were shopping, something just doesn't feel right, and Molly didn't want to say anything.  And when I went home to my husband, he said, with his behavior being so erratic, I'm hoping nothing is happening over there.
> And so multiple times I asked Molly, "Are you okay?  Are you okay?"  She's, like, "Yeah, it is fine.  I don't want to talk about it."  And so we just kept our eye to make sure there were no bruises or actually not physically harming her, but we never saw any bruises or anything like that.  Otherwise, we would have stepped in.

Tina also explained about times when she would provide J.A. with care during the day so Molly could get some sleep.  "[A] good handful of times, [Nicholas] was also upstairs sleeping."

Molly introduced an office note from Nicholas's doctor written in June 2021 with the following:

> Patient signed a contract the last time he came in to get six oxycodone daily.  The patient last week refill that early because he stated that he was going to be out of the area for the Memorial Day holiday weekend.  Then, he wanted a refill today.  It is very clear that

he is using the oxycodone much more quickly than the contract stated. . . . The patient does readily admit that he has been taking more oxycodone than he was supposed to. He is not really upfront [or] clear whether this was because of increased pain or whether because he has an issue. When confronted about his use of narcotics in Florida, the patient stated that he did not have a problem. However, earlier this year unbeknownst to me until later, he received 540 tramadol pills from his Florida physician.

I told the patient that I truly care for him and [I] care that he has pain and I do not doubt for a minute that he has pain. However, with that being said, I did remind him that he signed a pain contract that we are going to stay without contract. After thirty years of medical practice, I can tell manipulation when I see it. The patient is clearly trying to manipulate me. He was confronted with that and did admit to that. . . . I told him that if we ever detect that there is any variation in the contract that we had written, he will not be a patient here any longer.

Nicholas later obtained a new doctor, who provided a letter in October 2022 that stated Nicholas was "no longer taking Oxycodone for back pain and is not addicted to this medication." At trial, Nicholas denied having an addiction to prescription pills. But he admitted being prescribed and taking eight tramadol,[3] three oxycodone, one Ambien, and two Xanax daily. And he compared his need for pain pills to his need for oxygen or water: "[I]t is not something you can just say, oh, I'll go without. I'll go without oxygen today, or I'll go without water today, or I'll go without pain medication."

In its ruling, the district court found the following:

During the pendency of this action, [Nicholas] was in an accident. There is apparently criminal charges pending. It is not clear if those have been resolved or not. There is evidence that [Nicholas] was subject to road rage. This would be consistent with other evidence showing that [he] has a volatile personality when it comes to being placed in circumstances he does not agree with. That would include this custody dispute.
. . . .

---

[3] Nicholas testified he was prescribed twelve tramadol each day but "self-reduced" to eight.

Custody and physical care of the children was the most important component of this case. The Court heard lengthy testimony from [Nicholas] on this issue. Frankly, his testimony was hard to follow. It was evasive and needlessly confrontational. He simply could not answer a question without going into all the reasons he was justified in doing what he was doing and then taking the next step of attacking those who disagreed with him. The parties did not use this term during trial, but [Nicholas's] conduct is what is commonly known as "gaslighting." He goes to great efforts to convince all persons concerned that their recollection of what happened is wrong. He is manipulative and domineering.

On appeal, Nicholas generally challenges the value of the child and family investigator's opinion—noting that she never witnessed Nicholas with the children—and the weight the district court seemed to place on it. He minimizes the parties' inability to communicate, suggesting that it might improve without court proceedings hanging over their heads. He argues that awarding the parties joint legal custody is in the children's best interests.

While our review is de novo, "[w]e give weight to the findings of the district court, particularly concerning the credibility of witnesses." *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). And we agree with the district court; the parties' inability to communicate and cooperate "rise[s] above the 'usual acrimony that accompanies a divorce.'" *Gensley*, 777 N.W.2d at 715 (citation omitted). When Molly shared information about the children with Nicholas, he badgered her about the decisions she made while the children were in her care. And when she facilitated video calls between the young children and Nicholas—to support his relationship with the children—he took screenshots that he later used to show a cabinet the children could reach was unlocked (without any knowledge of what was held in the cabinet). Audio from one of the times the parties exchanged the children for a visit reveals Nicholas using the opportunity to demand

that Molly sign a contract promising to move to Florida. Nicholas's domineering personality and his attempts to manipulate are on full display in the parties' communication. This, combined with the child and family investigator's concern about future "tumultuous battles" regarding the children weighs heavily against awarding joint legal custody. *See id.* ("The overriding factor weighing against joint legal custody is the parties' utter inability to communicate with each other, which is a result of their toxic relationship.").

When testifying, the child and family investigator added:

> I feel it would be very difficult for these two to work together as joint legal custodians. Every single—it doesn't even have to be a decision. Every single situation that these two run into as parents becomes a blown-up mess for no reason most of the time. I mean, I haven't really seen a reason. These are small kids. There has been nothing major that has happened since the temporary order has been put in place.
> I mean, we see a lot of horrible custody situations, horrible divorces, bad things happen between people or kids being put in very unsafe situations. That is not this family. These kids are well taken care of. They are fine.
> Every little thing that occurs becomes a disaster, and it's—[Nicholas] wants to make it terrible for Molly, which in the turn makes it terrible in the kids' lives. And that, to me, is scary that that's happening now while they're very little, and we have so many years ahead of these two having to be parents of the same children.

Coupled with these communication issues, the geographical distance between the parties—with Molly in Maryland and Nicholas in Florida—also weighs against joint legal custody. *See In re Marriage of Behn*, 385 N.W.2d 540, 542 (Iowa 1986) (providing that while geographic separation does not prevent joint legal custody, it gave the court pause to award joint custody when one parent lived in the state of Washington and the other lived in Iowa).

Because there is clear and convincing evidence joint legal custody is unreasonable and not in the children's best interests, *see* Iowa Code § 598.41(2)(b), we affirm the district court's decision to award Molly sole legal custody.

**C. Physical Care.**

Nicholas argues he should have been awarded physical care of the children instead of Molly. But because we affirm the award of sole legal custody to Molly, we need not consider this claim—a parent without legal custody of a child cannot be awarded physical care. *Cf.* Iowa Code § 598.41(5)(a) (limiting the award of joint physical care to when the parents are awarded joint legal custody, thereby preventing the court from giving a parent without legal custody a share of physical care); *In re Marriage of Frazier*, 1 N.W.3d 775, 781 (Iowa 2024) ("Divorce under Iowa law is strictly statutory, and the district court's discretion in child custody proceedings is limited to considering the circumstances set forth in Iowa Code section 598.41." (cleaned up)). To put a finer point on it, a parent without legal custody lacks the "[r]ights and responsibilities . . . to decision making affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction." Iowa Code § 598.1(5). A parent lacking these decision-making rights and responsibilities cannot be the parent given "the right and responsibility to maintain a home for the minor child[ren] and provide for the routine care of the child[ren]." *Id.* § 598.1(7) (defining "physical care"); *see also In re Marriage of Hansen*, 733 N.W.2d 683, 691 (Iowa 2007) ("The parent awarded physical care maintains the primary residence and has the right to determine the myriad of

details associated with routine living, including such things as what clothes the children wear, when they go to bed, with whom they associate or date, etc.").

We affirm the district court's decision giving Molly physical care of the parties' minor children.

### D. District Court Attorney Fees.

The district court granted Molly's request that Nicholas pay $30,000 of her trial attorney fees "[d]ue to the needlessly protracted nature of these proceedings, the failure to timely provide required discovery, including exhibits, and the relative ability of the parties to pay."[4]  Arguing the district court abused its discretion, Nicholas challenges that award, arguing that insofar as he was ordered to pay Molly's fees as punishment for the protracted litigation, "none of the issues or points of contention can be attributed to one party alone."  He also argues that while he was earning more than $100,000 annually and Molly was not working outside the home, the court should have considered Molly's ability to earn an income and declined to award fees.  Finally, Nicholas asserts he should not be required to pay Molly's trial attorney fees because of the premarital agreement, which states:

> If either Party contests the validity of this Agreement or any provision thereof, that Party shall be responsible for the reasonable value of any legal services rendered on behalf of either Party by reason of the other Party's unsuccessfully contesting the validity of this Agreement or any provision hereof, whether such services arise out of court action or other; and such attorneys' fees shall be paid by

---

[4] Molly's attorney's fee affidavit from May 9, 2023—a few days after trial ended but before post-trial filings were completed—listed a total of $30,389.82.  Later, Molly's attorney filed a written closing argument, contested Nicholas's filing of four closing arguments, and resisted a motion to reconsider.  Nicholas's attorney's fee affidavit, filed the same day, included a total of $34,712.98 of fees and costs.

the Party unsuccessfully contesting the validity of this Agreement or any provision hereof.

Awards of attorney fees must be for fair and reasonable amounts and based on the parties' respective abilities to pay. *In re Marriage of Witten*, 672 N.W.2d 768, 784 (Iowa 2003). The district court has "wide" discretion when deciding whether to impose sanctions for discovery violations, *In re Marriage of Butterfield,* 500 N.W.2d 95, 98 (Iowa Ct. App.1993), and "considerable discretion in awarding attorney fees." *Witten*, 672 N.W.2d at 784 (citation omitted).

We start with Nicholas's argument that, pursuant to the premarital agreement, Molly should have to pay his trial attorney fees rather than him paying hers. But on its face, the attorney-fees provision is limited to proceedings specifically involving the validity of the premarital agreement—making Molly at most responsible for her own fees that were related to contesting the agreement and for Nicholas's fees incurred while defending it. Nicholas urges us to "reverse the award to Molly and order that Nicholas be awarded his attorney's fees in full for having to defend the [premarital] agreement." But here, while Nicholas's effort focused on applying the premarital agreement terms when considering the property award, he failed to explain how it would change the award, making the premarital agreement question irrelevant. Similar to that situation, as to the request for attorney fees from the district court, Nicholas gives us no basis to consider the premarital agreement as he failed to itemize his request for attorney fees, leaving us unable to make any award, even if we did determine the terms applied. Each party filed statements of the total amount of fees expended, but

neither provided an itemized billing, so we cannot discern what fee related to what work.

Because Nicholas is the party with the ability to pay the attorney fees and the cost of litigation was unnecessarily increased by his actions, we find no abuse of discretion in the district court's award of fees to Molly. Additionally, much like with the property distribution, Nicholas has failed to identify what attorney fees incurred by him or Molly were caused by litigating the issue of the premarital agreement. Even if the agreement is valid and enforceable, on the record before us we cannot determine how applying the agreement to the issue of attorney fees would lead to a different result. This is especially true because Nicholas cannot be allowed to drum up the cost of litigation on issues potentially covered by the premarital agreement and then force Molly to bear the costs. *See NevadaCare, Inc. v. Dep't of Hum. Servs.*, 783 N.W.2d 459, 470 (Iowa 2010) ("When a contract contains a clear and express provision regarding attorney fees, the court's award must be for reasonable attorney fees."); *accord id.* at 472 ("The party seeking to recover such fees must prove that the services were reasonably necessary and the charges were reasonable in amount."). We affirm the district court's ruling ordering Nicholas to pay $30,000 of Molly's trial attorney fees.

**E. Appellate Attorney Fees.**

Nicholas and Molly each ask us to award them appellate attorney fees. "Appellate attorney fees are awarded upon our discretion and are not a matter of right." *In re Marriage of Heiar*, 954 N.W.2d 464, 473 (Iowa Ct. App. 2020). When deciding whether to exercise our discretion, "we consider 'the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of

the appeal.'"  *Id.* (citations omitted).  We decline to award either party appellate attorney fees.

**III. Conclusion.**

Following our review of the property distribution, award of legal custody, award of physical care, and the order that Nicholas pay $30,000 of Molly's attorney fees, we affirm.  We decline to award either party appellate attorney fees.

**AFFIRMED.**