# IN THE COURT OF APPEALS OF IOWA

No. 19-1618
Filed August 5, 2020

IN RE THE MARRIAGE OF DAVID MICHAEL WATERHOUSE
AND RACQUEL WATERHOUSE

Upon the Petition of
DAVID MICHAEL WATERHOUSE,
        Petitioner-Appellee,

And Concerning
RACQUEL WATERHOUSE,
        Respondent-Appellant.
_____


        Appeal from the Iowa District Court for Linn County, Patrick R. Grady,

Judge.


        A mother appeals from an order transferring physical care of the parties'

minor child to the father.  **AFFIRMED.**


        Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West

Des Moines, for appellant.

        David G. Thinnes of Thinnes & Quint Law Offices, Cedar Rapids, for

appellee.


        Considered by Bower, C.J., and Doyle and Schumacher, JJ.

**SCHUMACHER, Judge.**

A mother appeals from a district court order denying her petition to modify visitation provisions of a divorce decree and granting the father's counterclaim to modify the decree's physical-care provisions. We affirm.

**Background Facts and Proceedings**

David Waterhouse and Racquel Waterhouse are the parents of minor child A.R.W. David filed a petition for dissolution of marriage in 2015. On June 1, 2017, the parties filed a stipulation, which was approved by the court in a July 7, 2017, dissolution decree. The decree adopted the stipulation and awarded the parties joint legal custody of A.R.W. Racquel was awarded physical care and David was awarded liberal visitation. The decree also provided that Racquel was entitled to occupy the marital home in Cedar Rapids for a period beginning June 1, 2017, and ending March 1, 2018. With David's acquiescence, Racquel stayed in the marital home an additional three months. The stipulation also contained the following language: "The parties agree that neither party shall relocate A.R.W.'s residence from the State of Iowa, or to a location within the State of Iowa that would preclude David from exercising his parenting time."

A.R.W.'s school year ended on June 1, 2018, and on June 4 Racquel and A.R.W. travelled to Las Vegas, Nevada, where Christian Clausen, Racquel's adult son and A.R.W.'s half-sibling, was residing. Racquel informed David the purpose of the trip was to visit Christian. On June 11, Racquel filed a petition for modification of the decree, citing a move to Nevada, seeking to alter David's visitation rights. On July 11, David filed an answer and counterclaim to Racquel's

petition, asserting a superior ability to provide care for A.R.W and seeking physical care.

On August 8, 2018, David filed an application for a contempt hearing due to Racquel's noncompliance with the 2017 decree. A hearing on the application was held on December 4. In a December 12 order, the court found that Racquel's departure to Nevada with A.R.W. "demonstrated a willful disregard for several provisions of the decree," specifically those provisions that allotted David care time with A.R.W. several times per week, required joint decision-making as to A.R.W.'s education, and required the consent of each parent prior to taking A.R.W. out of Iowa. The court ordered that physical care of A.R.W. be placed with David pending trial on the modification petition, noting it "considered what is in the child's best interests and finds that A.R.W. requires a stable residence." David had difficulty, in spite of the entry of this court order, in having A.R.W. returned to Iowa. Ultimately, he flew to Nevada and retrieved A.R.W. Since January 3, 2019, A.R.W. has lived in the former marital home with David in Iowa.

Trial on the modification was held on March 7, 2019, at which time A.R.W. was twelve years old. At the trial, A.R.W. expressed a preference to live with his mother in Nevada. On April 16, following the trial but prior to the issuance of the ruling, Racquel filed a notice that she would be moving to Dallas, Texas, to take a job with a former employer. The court re-opened the record to allow affidavits to be filed concerning the most recent move. Both parties filed affidavits on May 8, 2019, with Racquel's affidavit indicating a move to Garland, Texas.

On June 6, the district court ruled on the competing petitions to modify, granting the parties joint legal custody of A.R.W. and awarding David physical

care. The district court found David's gross annual income to be $73,776 and Racquel's to be $21,570. No child support was ordered.[1] Racquel was awarded one month of visitation in summer 2019 and winter break, as well as "liberal care time with A.R.W. anytime she visits Iowa after 24-hour notice is provided to David." A supplemental order was entered on August 28, 2019, clarifying the visitation. Racquel appeals.

**Standard of Review**

We review de novo a grant of a petition to modify the physical care provisions of a divorce decree. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015).

> A de novo review "does not mean [the appellate courts] decide the case in a vacuum, or approach it as though the trial court had never been involved." *Davis-Eisenhart Mktg. Co. v. Baysden*, 539 N.W.2d 140, 142 (Iowa 1995). Rather, "great weight" is given the findings of fact of the trial court where the testimony is conflicting. *See id.* (citation omitted). This is because the trial court, with the advantage of listening to and observing the parties and witnesses, is in a far better position to weigh the credibility of witnesses than the appellate court, which is limited to a written record. *See In re Marriage of Zebecki*, 389 N.W.2d 396, 398 (Iowa 1986); *Hensch* [*v. Mysak*, 902 N.W.2d [822,] 824 [(Iowa 2017)]; *see also In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984); *In re Marriage of Gensley*, 777 N.W.2d 705, 713 (Iowa Ct. App. 2009) (recognizing the district court can "listen to and observe the parties and witnesses" and giving weight to the district court's credibility determinations); *Birusingh v. Knox*, 418 N.W.2d 80, 82 (Iowa Ct. App. 1987). We give weight to the factual findings of the district court, especially when considering

---

[1] The record reflects that Racquel receives $13,770 in annual social security disability benefits and a projected $7800 in additional income from her part-time job. When David is given the dependency exemption, the trial court determined that Racquel's monthly support obligation is $307.91 per month. The trial court further found, "When A.R.W.'s social security benefits of $574 per month are credited to that amount, Racquel has no child support obligation."

the credibility of witnesses, but are not bound by them. *See* Iowa R. App. P. 6.904(3)(g*).

*Bowlin v. Swim*, No. 19-1021, 2020 WL 2988537, at *1 (Iowa Ct. App. June 3, 2020).

**Discussion**

A court may modify the physical care provisions of a decree "when there has been a substantial change in circumstances since the time of the decree, not contemplated by the court when the decree was entered, which was more or less permanent, and relates to the welfare of the child." *Melchiori v. Kooi*, 644 N.W.2d 365, 368 (Iowa Ct. App. 2002). "The party seeking to modify a dissolution decree thus faces a heavy burden, because once custody of a child has been fixed, 'it should be disturbed only for the most cogent reasons.'" *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016) (quoting *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983)).

To sustain the district court's order modifying provisions related to physical care of A.R.W., we must also find on our de novo review that David has shown by a preponderance of the evidence that his requested modification was justified by a superior ability to minister to A.R.W.'s well-being. *See id.*; *see also In re Marriage of Whalen*, 569 N.W.2d 626, 628 (Iowa Ct. App. 1997). "In determining which parent serves the child's best interests, the objective is to place the child in an environment most likely to bring the child to healthy physical, mental, and social maturity." *In re Marriage of Courtade*, 560 N.W.2d 36, 38 (Iowa Ct. App. 1996).

A parent requesting modification of custody bears a heavy burden, and a custodial parent's relocation does not automatically constitute a significant change in circumstances. *Frederici,* 338 N.W.2d at 158, 161. However,

> [i]n determining whether removal should be prevented, the trial court must consider all of the surrounding circumstances. They include the reason for removal, location, distance, comparative advantages and disadvantages of the new environment, impact on the children, and impact on the joint custodial and access rights of the other parent.

*Id.* at 160. "Because custody cases are fact specific, prior cases have little precedential value; we must base our decision primarily on the particular circumstances of the parties in this case. The most important factor is the best interests of the children." *Hoffman*, 867 N.W.2d at 40 (Waterman, J., dissenting) (cleaned up) (citations omitted).

"[O]ur case law places greater importance on the stability of the relationship between the child and the primary caregiver over the physical setting of the child." *In re Marriage of Williams*, 589 N.W.2d 759, 762 (Iowa Ct. App. 1998); *see also Whalen*, 569 N.W.2d at 630 ("While stability is important in a child's life, stability can be nurtured as much by leaving children with the same custodial parent as leaving them in the same neighborhood."). "Where there is good reason for moving children in our highly mobile society, a change in the custodial parent's geographic location is not justification in itself for change of custody." *Whalen*, 569 N.W.2d at 630. However, "[a] decision by a joint custodial parent with physical care of minor children to change residences is the kind of decision the other joint custodian has a right to be consulted about." *Hoffman*, 867 N.W.2d at 32 (internal quotation marks and citation omitted).

A child's preference is given some weight, but less weight in a modification than in an original custodial determination. *In re Marriage of Mayfield,* 577 N.W.2d 872, 873 (Iowa Ct. App. 1998); *see also In re Marriage of Behn,* 416 N.W.2d 100, 101-02 (Iowa Ct. App. 1987). "Deciding custody is far more complicated than asking children with which parent they want to live." *In re Haag*, No. 99-1766, 2000 WL 714408, at *2 (Iowa Ct. App. May 31, 2000) (citing *In re Marriage of Ellerbroek,* 377 N.W.2d 257, 258 (Iowa Ct. App. 1985)).

The parties' pleadings both allege that a substantial change of circumstances occurred. In the June 2019 order granting David physical custody, the district court found that "David ha[d] established a substantial change of circumstances based on the distance and circumstances of Racquel's moves and her failure to follow the decree's provisions about notice when relocating." The court further found him to be the superior parent.

With the foregoing legal framework in mind, we consider whether the record supports that David met his heavy burden. The record contains little reference to the comparative advantages and disadvantages of the proposed new environment, either Nevada or Texas. The testimony comparing A.R.W.'s academic performance in Nevada and in Cedar Rapids does not weigh heavily in favor of any particular outcome, particularly because the mother filed a notice of her departure from Nevada before a ruling was entered by the trial court. The court found that A.R.W.'s grades in Iowa remained above average despite his stated desire to live with his mother. The record contains no information regarding educational opportunities near Racquel's new residence in Texas.

In reviewing the remaining *Frederici* factors—the reason for removal, location, distance, impact on the children, and impact on the joint custodial and access rights of the other parent—the record supports the following determinations.

At the time of the initial dissolution of marriage, the parties agreed that Racquel would stay in the marital home for nine months, a period that ended up stretching to twelve months. She testified she was unable to secure housing in the Cedar Rapids area by the end of that period. She made a unilateral decision to remove the child from Iowa. This was in contravention of the stipulation and decree. Due to this unannounced move, David was denied the care time provided in the parties' agreement as adopted in a decree of the district court. Racquel also failed to disclose the child's location after their arrival in Nevada. Racquel enrolled the child in school in Nevada without consulting David. Her conduct did not "assure the child the opportunity for the maximum continuing physical and emotional contact with both parents." *See* Iowa Code § 598.41(1)(a) (2018). We consider it a "significant factor" in determining the proper physical care arrangement. *See id.* § 598.41(1)(c). Racquel was found in contempt of court approximately six months prior to the modification trial.

Racquel's health issues were not discussed at length at trial. She testified, "It was not the reason I left." Her move appears to be motivated by housing, although David offered an apartment to Racquel in Cedar Rapids. Racquel was reliant on her adult son for housing during the time in Nevada.

We, like the district court, find that David met his burden to show a substantial change in circumstances since the time of the decree, not

contemplated by the court when the decree was entered, which was more or less permanent, and relates to the welfare of A.R.W.

We next turn to consider whether David has shown "an ability to minister more effectively to the child[ ]'s well-being." *See In re Marriage of Thielges*, 623 N.W.2d 232, 235 (Iowa Ct. App. 2000).

By accompanying Racquel, A.R.W. benefited from continuity of care, although Racquel offers no additional reasons why these moves were advantageous to A.R.W. Iowa courts have approved of far-flung moves where career advancement was a goal of the relocation and where there is "no hint" of an attempt to undermine another parent's relationship with the child. *See Frederici*, 338 N.W.2d at 160. The record does not contain evidence that such move was for a career advancement. The opposite is true, as Racquel was unemployed after the move and at the time of trial.

The district court found that Racquel would move "regardless of [the move's] impact on A.R.W." The court further found that, "If Racquel decides she wants to move, she will move regardless of its impact on A.R.W. If she thinks A.R.W. does not need to spend time with David, then she will impede it regardless of its impact on A.R.W., David or the existence of court orders." These findings are supported by the evidence. When asked if she was "committed to encouraging the relationship or supporting the relationship between [A.R.W.] and Mr. Waterhouse," Racquel responded "I have been so far." In response to questioning regarding her decision to take A.R.W. to Nevada in violation of the decree's provisions, both Racquel and Christian made vague assertions that the stipulation was not the

same one Racquel had intended to or did in fact sign, casting doubt on their ability to abide by the court-approved stipulation.

Contrastingly, the evidence shows that David is able and willing to facilitate Racquel's care time with A.R.W. David has stable employment and has lived in Cedar Rapids throughout the pendency of these proceedings, where A.R.W. has connections with school, friends, and physicians. David continued paying child support even after the show-cause hearing, when A.R.W. was under his care. There is no indication anywhere in the record that David failed in providing Racquel care time since he took over physical care of A.R.W. in early 2019. The record supports the district court's finding that David is in a superior position to offer A.R.W. stability. Racquel has chosen to make seemingly unplanned moves in violation of the decree. She supports her request to remain the physical custodian "[b]ecause I'm his mom and because I love him and it's hard for me to go a day without him." This statement is in line with David's testimony that A.R.W. feels responsible for his mom.

Racquel also appears to make a passing argument that A.R.W. should not be separated from his brother. We presume that siblings should not be separated. *See In re Marriage of Pundt*, 547 N.W.2d 243, 245 (Iowa Ct. App. 1996). A.R.W. was living with his half-brother Christian Clausen while in Nevada. However, A.R.W. was not living with Christian until Racquel took A.R.W. from Iowa in violation of the decree. Christian is an adult. Therefore, we do not give this normal presumption concerning siblings a great deal of weight. Instead, we consider whether A.R.W.'s ability to live with his brother weighs in favor of a particular physical care arrangement. Although Racquel relied on Christian for housing in

Nevada, it is unclear whether Christian can assist his mother in providing a stable living situation.

At the trial on the petitions for modification on March 7, 2019, Christian said he did not have any concern he would end up relocating to another city in another state soon due to his obligations in the armed forces. Yet, in Racquel's May 8, 2019 affidavit, she said, "my son Christian decided not to renew his contract with the Air Force." This decision was made before the issuance of the court's modification order and contributed to the uncertainty of A.R.W.'s living situation between trial and the district court's modification order.[2] Racquel further noted in the affidavit that she would be moving to Texas, into her "own place." The affidavit made no mention of Christian. It is unclear from the record whether she is relying on Christian for housing in Texas. Any stability Christian offered his mother was undercut by the change in his own employment and housing circumstances shortly after trial and before the court's modification order.

As the district court noted, "Racquel went to Nevada with no job and relied on her disability benefits, David's child support and alimony, and Christian providing a home." Racquel's move to Texas allowed her to obtain employment, albeit at a much lower salary level than David, and provided her an environment that would ameliorate her health issues. However, there is no evidence in the record of any details of A.R.W.'s living or educational situation in Texas, aside from Racquel's assertion in the affidavit that A.R.W. will have his own bedroom.

---

[2] Christian testified at trial that his orders would expire on July 9, 2019.

Although she now has part-time work at the rate of $10.00 per hour, she asserts that her hours could range from "a few hours per week to potentially full time."

With respect to A.R.W.'s relationship with David, the parties both discussed an incident in which David used some amount of force to get A.R.W. out of bed for school, and they disagree as to whether the incident shows David's ability to inculcate responsibility in A.R.W. or instead reveals an abusive tint. The district court addressed this issue and found that "David would be more forceful in getting [A.R.W.] to school" but determined that David offered the child stability and that Racquel was unable to provide the same.

Racquel offered six recordings, which appear to be excerpts from contentious conversations concerning A.R.W. telling of racist jokes, A.R.W.'s behavior at a soccer game, and A.R.W.'s refusal to eat what was prepared for supper. The record is void of when the recordings were made, but they appear to have been recorded by either Racquel or A.R.W. The district court found David's parenting flaws could be improved upon but was less optimistic about Racquel. The district court weighed the recordings in its ruling. With respect to these short recordings, we recognize the district court is in a better position to "listen to and observe the parties and witnesses," including the parties' testimony regarding the recordings. *See In re Marriage of Gensley*, 777 N.W.2d 705, 713 (Iowa Ct. App. 2009).

**Conclusion**

We agree with the district court's assessment that David has proven a substantial change of circumstances and that the more compelling issue is his ability to minister more effectively to the child's needs. We also agree with the

district court's assessment that both parents demonstrated parenting flaws. We, like the district court, find significant Racquel's disregard for the provisions of the divorce decree, which led to her being found in contempt. We also consider Racquel's inability to support a relationship with the child's father, which encompasses her violations of the decree and efforts to secrete the child's location in Nevada. We also consider the subsequent move from Nevada to Texas after the trial when considering Racquel's ability to provide the parties' twelve-year-old son a stable home. David has remained employed as an auditor in the Cedar Rapids area and has retained stable housing. David's stability provides a familiar environment for the child.

Despite some documented clashes of personality between the father and the child, A.R.W. is doing well in school in Cedar Rapids and has established relationships with his school, friends, and the medical community. Racquel's counterarguments mostly come down to the different nature of each party's parenting style. We agree that David met his heavy burden to show a substantial change in circumstances since the time of the decree, not contemplated by the court when the decree was entered, which was more or less permanent and relates to the welfare of the child. *See Melchiori*, 644 N.W.2d at 368. We further agree with the district court based on the totality of the record that he has proven he can more effectively parent the parties' son.

We affirm the district court's order transferring physical care to David and all other aspects of the order, including the award of visitation to Racquel.

**AFFIRMED.**