# IN THE COURT OF APPEALS OF IOWA

No. 21-1986
Filed November 17, 2022

IN RE THE MARRIAGE OF THOMAS ALAN BEASLEY
AND MIYOKO ELIZABETH HIKIJI

Upon the Petition of
**THOMAS ALAN BEASLEY,**
    Petitioner-Appellant,

**And Concerning
MIYOKO ELIZABETH HIKIJI,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg,

Judge.

Thomas Beasley appeals a ruling modifying the decree dissolving his

marriage to Miyoko Hikiji.  **AFFIRMED.**

Cathleen J. Siebrecht of Siebrecht Law Firm, Des Moines, for appellant.

Benjamin Folladori of Marberry Law Firm, P.C., Urbandale, for appellee.

Considered by Bower, C.J., Tabor, J., and Mullins, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2022).

**MULLINS, Senior Judge.**

Thomas Beasley appeals a ruling modifying the legal custody and physical care provisions of the decree dissolving his marriage to Miyoko Hikiji. He argues the court erred in failing to dismiss the petition to modify and abused its discretion in awarding trial attorney fees. Both parties request an award of appellate attorney fees.

## I.     Background Facts and Proceedings

The parties married in 2005, and the marriage produced two children, born in 2009 and 2010. Thomas petitioned for dissolution of the marriage in 2013. Ultimately, in 2015, the parties stipulated on all issues, and the court entered a dissolution decree awarding the parties joint legal custody and joint physical care. The decree mandated the appointment of a parenting coordinator "to assist the parties in resolving parenting issues that they are unable to resolve on their own."

In December 2017, Miyoko filed an application for rule to show cause, noting Thomas "unilaterally terminated" the parenting coordinator and he thereafter refused to work with Miyoko in obtaining a new coordinator. In his resistance and counter-application, Thomas alleged the parenting coordinator "withdrew" and sessions with the parenting coordinator were not beneficial in any event.[1] In its March 2018 ruling, the court found Thomas in contempt of the parenting-coordinator provision of the decree. As a sanction, the court ordered: "Thomas shall cooperate with Miyoko in the selection of a new parenting

---

[1] The parties raised various other issues in their applications for rule to show cause.

coordinator." A new parenting coordinator was appointed in June.[2] But according to Miyoko's testimony at the modification trial, the parties only met with the new coordinator for about six months before the coordinator "recognized that it also was not working." By the time of trial, the parties had not met with the coordinator for roughly two years.

Miyoko testified sessions with neither of the appointed parenting coordinators were productive. According to Miyoko, when an agreement is made during these sessions, Thomas does not follow it after he leaves. She testified several decisions about the children never end up being made because they cannot agree on anything.

In September 2019, Miyoko filed a modification petition. Therein, she alleged the decree "contemplated that the parenting coordinator would be able to assist the parties in resolving issues that they could not otherwise resolve themselves" but, despite the utilization of a parenting coordinator, "the parties are still unable to efficiently and adequately resolve parenting issues [that] directly affect their two minor children." Miyoko also alleged Thomas failed to cover his equal share of the children's expenses and Thomas does not support her "relationship with the minor children and has often made unilateral decisions in violation of the parties['] joint legal custody agreement." Based on these allegations, Miyoko requested the decree be modified to place the children in her physical care and "such other and further relief as the court deems just and

---

[2] We note the road to the appointment of the new coordinator was not painless, as it involved Miyoko's filing of another application for rule to show cause and a corresponding motion for sanctions and attorney fees filed by Thomas.

equitable under the circumstances." In his answer, Thomas requested the petition be dismissed.

Trial was ultimately held over two days in August 2021. At the time of trial, the children were ten and twelve years old, Thomas was fifty-eight, and Miyoko was forty-four. Both parties are gainfully employed and receive veteran's benefits, with Thomas and Miyoko respectively earning roughly $97,000 and $90,000 annually. Each have homes suitable for the children. Since the entry of the decree in 2015, the parties' attempts at co-parenting have been less than fruitful. Thomas himself agrees the parties "have a long history of animosity dating back to the dissolution proceedings." Despite specific expectations of the parties being stated in the original decree and the parties' use of parenting coordinators, time has clearly not changed things.

For example, in January 2016, mere months after the decree was entered, the older child's therapist informed the parties that she could not work with the child any longer due to the hostilities between the parties. The therapist opined the child's "issues directly stem from the hostility and ongoing conflict that exists between" the parties and "she has been regularly exposed to this conflict and [it] is having a negative and traumatic impact on her." Due to the parties being "unable or unwilling to work on addressing the co-parenting relationship," the therapist determined she could no longer work effectively with the child.

Thomas has initiated contact with the children's school without including Miyoko, which, according to Miyoko, has been a part of Thomas's smear campaign against her. Specifically, in emails beginning in early 2017, Thomas indicated to educators that the children feel unsafe in Miyoko's home due to her discipline

practices, Miyoko talks negatively about him around the children, and she uses profanity. None of Thomas's allegations are supported by the record. Thomas's actions were later addressed by the parenting coordinator and, in September, the parties signed an agreement that all communications by either party with the school would include the other party. According to Miyoko, however, Thomas disregarded this agreement and continued to contact educators to further his smear campaign against her. Thomas's emails to educators also disclose that he has developed code words with the children that the children should use to alert others of abuse at the hands of Miyoko. The district court found this both disturbing and outrageous, as do we.

Also in the spring of 2017, someone began lodging child-welfare complaints against Miyoko with the Iowa Department of Human Services (DHS). While Thomas denied in his testimony that it was him, the district court found he instigated the complaints. All in all, Miyoko has been investigated by DHS five times since the entry of the decree, all of which concluded the allegations were unfounded. There is also evidence that Thomas speaks negatively about Miyoko to the children. In one text message sent by Thomas in or about March 2018,[3] Thomas spoke to the older child about "the misery your mom has caused" and describing "[c]ombat" with her "as hell on Earth," noting "[l]iving with your mom . . . or leaving her has been worse and I am convinced more of what hell must look like." According to Thomas, he was responding to the child about the child's

---

[3] Thomas testified he believed he sent this text message to the child in June or July 2021. When confronted with evidence about the message's origin on cross-examination, Thomas agreed his testimony was "inaccurate."

concerns for Miyoko's discipline practices, and he was encouraging the child "to just deal with her mother's actions." All things considered, Thomas's conversations with the children have resulted in Miyoko's authority being undermined when the children are in her care. On another occasion shortly before trial, Thomas berated Miyoko over the phone while he was in the children's presence about a change in the parenting schedule that he had already agreed to. Miyoko testified she could hear the children crying in the background.

One of many examples of the parties' inability to effectively communicate involved the children's return to in-person learning. Miyoko conveyed to Thomas her reservations about the children returning to in-person learning but, unbeknownst to Miyoko, Thomas went ahead and enrolled them to return to in-person learning. Miyoko did not know about this until the school called her about it. When Miyoko emailed Thomas about her confusion and concerns, he responded, "I will not discuss this at all with you other than I talked to the school and there will be no change at least until the Spring semester." When the children were attending school virtually, Miyoko desired the children attend tutoring outside of school to ensure they remained on track. When Miyoko attempted to discuss tutoring with Thomas through email, he responded, "I will not pay any of the cost of the tutoring" and complained tutoring was insufficient to make up for in-person learning.

Registering the children for activities has also been difficult. The children's participation in extracurriculars appears to turn on whose care they are in. What should have been a minor exchange between the parties regarding extracurricular activities for the fall of 2021 ended up being an angry string of emails between the

parties that accomplished next to nothing, other than more hostility. The parties could not even agree about something as simple as an eye exam and glasses for one of the children. In January 2021, Miyoko advised Thomas through email that she was getting one of the children new frames, and Thomas responded: "I do not agree. I will be doing the eye exam and frames differently." In his testimony, Thomas basically explained he just wanted to take the child to a provider that was covered by his insurance. Even if that is true, Thomas certainly did not advise Miyoko of that preference. While Miyoko has traditionally taken the children to all of their health-related appointments, Thomas took one of the children to the doctor on one occasion because she was short of breath. The child ended up getting prescribed an inhaler, but Thomas never told Miyoko about it; she only learned about it when the pharmacy called her about the prescription. Had she not been the pharmacy's point of contact, Miyoko probably would have never known about the condition.

While the decree does not include a right-of-first-refusal provision, Thomas also frequently has others care for the children during his parenting time if he is unavailable instead of asking Miyoko, which appears to be an ongoing point of contention between the parties. Miyoko testified Thomas has declined to tell her who he has care for the children, generally taking the position that "if it was on his time, it wasn't [her] business." The parties' second parenting coordinator essentially agreed this is Thomas's stance, which she called "parallel parenting." Thomas testified he only has others watch the children on his time when he is unavailable because Miyoko does the same thing. Yet, on one occasion when Miyoko asked Thomas if he could watch the children when she needed to work on

a Saturday, he responded by email: "No. I am not giving up my free time in exchange for being your sitter." On another occasion, Thomas agreed to watch the children while Miyoko went to a meeting, but when Miyoko went to drop them off at Thomas's home, he wasn't there.

In her testimony, the second parenting coordinator, who worked with the parties from summer 2018 through spring 2019, agreed there were no "positive results" of joint sessions with the parents. She explained "there was mostly hostility that was being generated, and it became nonfunctional in terms of ability to establish goals and change patterns and do things on behalf of the girls." The coordinator opined both parents are suitable custodians but agreed "shared parenting would be very difficult" given the hostility and communication issues between the parties. She also opined the parties' ability to communicate "was getting worse rather than better." That said, the coordinator believed the children's needs were being met. For his part, Thomas testified to his disagreement that the difficulties the parties have with communication are so bad that they are unable to make joint decisions. But, in reality, the animosity and inability to communicate between the parties is so bad that they are not even able to speak on the phone.

In its ruling, the court granted Miyoko sole legal custody and physical care. While Thomas challenged the court's consideration of modification of legal custody because it was not raised in the petition, the court found he was on notice the issue was in play and he had the opportunity to, and did, litigate the issue at trial. While the court agreed Miyoko has not been perfect in interacting with Thomas, the court found:

Thomas has demonstrated a vindictiveness toward Miyoko that interferes with and is damaging to the children. Using the children as conduits for Thomas'[s] attempts of attacking and bringing into question the ability of Miyoko as a suitable and an effective parent is not in the best interests of the parties' children. The many instances of suggesting that Miyoko is somehow abusing or neglecting the children by the myriad of DHS complaints instigated by Thomas is disturbing. The very suggestion to the children that Miyoko is a bad or even dangerous parent followed by DHS investigators and others questioning or interrogating the children is a form of trauma in and of itself. It clearly is not in the best interests of the children. The use of the children's phones to send messages as if from the children themselves is disturbing and not in the children's best interests. The use of code words that Thomas instituted with the children strongly suggests to the children that they must be constantly on guard and fearful of Miyoko. Thomas is unable or unwilling to support Miyoko's relationship with the children.

. . . .

. . . Thomas'[s] actions and behavior of undermining Miyoko and placing the children directly in the middle of disputes between Thomas and Miyoko is unacceptable and not in the children's best interests.

The court specifically rejected Thomas's suggestions "that things weren't that bad and that no changes should be made to legal custody or physical care." The court chronicled the instances that demonstrated the parties' inability to effectively communicate for the benefit of the children and found the parties' issues are beyond the "usual acrimony" between divorced parents. Given the parents' ongoing discourse "year after year" and inability to resolve issues, the court found the children's best interests demand having only one legal custodian who can make decisions in a timely fashion, thus resulting in a more stable environment for the children to live their lives. The court awarded sole legal custody to Miyoko, finding she "is the superior parent to provide an environment most likely to bring the children to good health, both physically and mentally, along with social maturity, safety and to bring some sense of normalcy." Having awarded Miyoko

legal custody, the court likewise granted her physical care and entered correlating modifications concerning visitation, child support, and other matters. The court also awarded Miyoko trial attorney fees.

Thomas appeals.

## II.     Standard of Review

An action to modify a decree of dissolution of marriage is an equitable proceeding, which we review de novo. Iowa R. App. P. 6.907; *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). We give weight to the factual findings of the district court, especially when considering the credibility of witnesses, but we are not bound by them. Iowa R. App. P. 6.904(3)(g). The best interests of the children are our primary consideration. Iowa R. App. P. 6.904(3)(o); *Hoffman*, 867 N.W.2d at 32. We review attorney fee awards for an abuse of discretion. *See In re Marriage of Guyer*, 522 N.W.2d 818, 822 (Iowa 2004).

## III.    Discussion

Thomas argues the court erred in modifying the decree, claiming Miyoko did not request modification of legal custody, she failed to meet her burden for modification, and the children were thriving under joint custody and physical care.

### A.     Legal Custody

#### 1.     Notice

We first consider Thomas's claim that "[t]he district court should not have considered Miyoko's late request for sole legal custody of the children" because "[s]he did not put Thomas on notice of her request for sole legal custody by pleading the same in her petition for modification." Thomas submits the request

for legal custody was not made until Miyoko filed her "specific request for relief" shortly before trial.

True, Miyoko's modification petition did not specifically request modification of legal custody. At the August 2021 trial, Miyoko testified about her request for joint legal custody, in line with her recently filed request for relief. Later, Thomas's counsel submitted legal custody was not an issue before the court because it was not raised in the petition. Miyoko's counsel responded that in the February 2020 order following the pretrial conference, "legal custody was indicated as an issue for trial." Looking back, that order did note one of the "disputed issues" as "child custody." Counsel submitted that order provided Thomas with sufficient notice that legal custody was in play. Referring to the December 2020 trial scheduling order, Thomas's counsel acknowledged "child custody" was one of the "contested issues," but argued that was not a sufficient indication of legal custody because the petition only requested modification of physical care. The court overruled Thomas's objection to questioning concerning legal custody. In its modification ruling, the court found "Thomas had sufficient notice of Miyoko's request for sole legal custody," highlighting the December 2020 trial scheduling order that noted child custody as a contested issue and Miyoko's proposed relief, although it was "filed shortly before trial." The court also noted Thomas did not object to Miyoko's proposed relief as being admitted as an exhibit. All in all, the court found Thomas was "not surprised," and he "proceeded with trial knowing Miyoko was seeking sole legal custody."

Our court has taken differing paths on this issue. On the one hand, in *Bowlin v. Swim*, which the district court relied on here, a father "argue[d] the district court

should not have considered [the mother's] request for sole legal custody because she requested joint legal custody in her petition and claim[ed] he did not have adequate notice she was requesting sole legal custody." No. 19-1021, 2020 WL 2988537, at *5 (Iowa Ct. App. June 3, 2020). While we agreed the petition did not request sole legal custody and no formal filing was ever made that requested sole legal custody, we found that, because the father knew "or should have known that [the mother] was seeking sole legal custody at trial," the father had sufficient notice the issue was before the court. *Id.* The circumstances triggering the father's awareness included the mother's proposed temporary custody order granting her sole legal custody, her answers to interrogatories, her testimony, and her request for relief including sole legal custody that was admitted without objection. *Id.* at *6.

More recently, in *Moses v. Rosol*, we considered a father's "claim that the district court should not have modified the legal custody provision of the decree." No. 21-1091, 2022 WL 949749, at *3 (Iowa Ct. App. Mar. 30, 2022). Noting the mother's petition and pre-trial brief did not request modification of legal custody, we agreed. *See id.* Specifically, we concluded "that because [the mother's] petition only sought a change in physical care, legal custody was not properly before the court even by notice-pleading standards." *Id.*

But the case now before us falls closer to *Bowlin*, which had various indications in the record that legal custody was in play, than it does to *Moses*, which had few if any indications in the record that the issue was being pursued. While the petition here only requested modification of physical care, some of the allegations contained therein focused on the parties' inability to "adequately address issues with the minor children." These allegations implicated legal

custody. *See* Iowa Code § 598.1(5) (2019) (defining "legal custody" or "custody" to include rights and responsibilities for decision making affecting the children); *cf. Putnam v. Walther*, 973 N.W.2d 857, 863 n.2 (Iowa 2022) ("Under our notice pleading approach, a pleading is sufficient if it informs the defendant of the incident giving rise to the claim and of the claim's general nature."). The petition also alleged Thomas violated the legal custody provisions of the decree, and requested "such other and further relief the court deems just and equitable under the circumstances."

As early as February 2020, a pretrial order noted "child custody" was an issue, with no limiting reference to physical care or physical custody. This was another signal that indicated legal custody was in play, and that signal was reverberated in subsequent pretrial orders. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007) ("Iowa law distinguishes custody from physical care."). Also, Miyoko's proposed relief that was admitted as an exhibit without objection requested sole legal custody and, while Thomas did object to questioning of Miyoko on the issue of legal custody, that objection did not come until the conclusion of Miyoko's direct examination. Objection or not, Thomas was clearly prepared to litigate the issue of legal custody at trial and did so. There is no indication he would have tried his case differently or presented other or different evidence if the specific term "legal custody" had been included in the pretrial order.

Examining the circumstances of this case, it falls much closer on the spectrum to *Bowlin* than it does to *Moses*. On our review, we find the issue was properly before the court, and we reject Thomas's challenge to the award on the basis that it wasn't.

###### 2. Merits

On the merits, Thomas argues the court erred in modifying legal custody from joint to sole in favor of Miyoko. We first note Thomas's brief intertwines his arguments against modification of both legal custody and physical care. As to the rationale followed by the district court in modifying legal custody, he asserts "Miyoko failed to cite any problems, choices or decisions that had not been solved," and "[t]hese parents have been able to successfully enroll the children in numerous extra-curricular activities." As he did in the district court, he essentially argues the tension, hostility, and communication issues between the parties are not so bad as to warrant modification of legal custody.

A party seeking modification of legal custody

> must prove by a preponderance of the evidence a substantial change in circumstances occurred after the decree was entered. The party seeking modification of a decree's custody provisions must also prove a superior ability to minister to the needs of the children.
>     The changed circumstances affecting the welfare of children and justifying modification of a decree "must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary." The party seeking to modify a dissolution decree thus faces a heavy burden, because once custody of a child has been fixed, "it should be disturbed only for the most cogent reasons."

*In re Marriage of Roberts*, 954 N.W.2d 757, 761 (Iowa Ct. App. 2020) (quoting *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016)).

As to the requisite change in circumstances, the legal custody provisions of the 2015 decree contemplated the parents would have equal access to information, participate equally in all decisions affecting the children, "act to foster feelings of affection and respect between the children and the other party," and not "do anything which may estrange the children from the other party or impair any

child's high regard for the other party." The decree also contemplated that the parties could meet these expectations with the assistance of a parenting coordinator. While "the district court was apparently hopeful that the parties were capable of cooperating in those matters affecting the best interests of their children," "[i]t is now quite clear that this is not the case." *In re Marriage of Rolek*, 555 N.W.2d 675, 677 (Iowa 1996). As a result of Thomas's preference for "parallel parenting," the parties did not have equal access to information and they did not participate equally in important decisions affecting the children. He clearly acted with intentional dominance in those areas. And the record is quite clear that Thomas has acted against the expectations that he support the relationship between the children and Miyoko and not take actions to ostracize her as a parent. This is all a result of the parties' clearly unabated disdain for one another.

As the supreme court has stated, joint custody arrangements between "parents who demonstrate they are able to put aside their differences for the sake of their . . . children" should generally be maintained. *Harris*, 877 N.W.2d at 440. On the other hand, modification is generally appropriate "when 'shared custody provisions . . . incorporated into the decree have not evolved as envisioned by either of the parties or the court' or when the parents simply 'cannot cooperate or communicate in dealing with their children.'" *Id.* at 441 (quoting *In re Marriage of Walton*, 577 N.W.2d 869, 870 (Iowa Ct. App. 1998)). Here, we are confronted with the latter situation, which the parties have shown year after year is a circumstance that is more or less permanent, not temporary. Simply stated, because the joint legal "custody provisions agreed to by these parties and incorporated into the decree have not evolved as envisioned by . . . the court," there has been a

substantial change in circumstances sufficient to warrant modification of the decree. *See Walton*, 577 N.W.2d at 870. Because of the ongoing discord between the parents and their inability "to agree on many of the fundamental decisions that must be made in their children's lives," the "vesting of such decision-making power in one parent [is] preferable." *Rolek*, 555 N.W.2d at 677.

Aside from arguing against modification of legal custody, Thomas does not claim that the court should have awarded him sole legal custody instead of Miyoko. To the extent he argues she failed to meet her burden to show a superior ability to minister to the children's needs because the parties are equally competent parents, we disagree. While we agree with the district court that Miyoko has not been a "perfect" co-parent either, and we acknowledge many of the factors contained in Iowa Code section 598.41(3) result in a finding that both parents are suitable generally, our consideration of the parties' ability to communicate and support the other's relationship with the children tips the scale in favor of Miyoko as the superior parent. *See* Iowa Code § 598.41(3)(c), (e). The evidence shows Miyoko has at least attempted co-parenting communication and decisions with Thomas, but Thomas has made clear he wants no part in a joint parenting enterprise. Also, Thomas has engaged in various acts to undermine Miyoko's relationship with the children. So we find Miyoko met her burden on this point as well.

Finding Miyoko met her burden to show a substantial change in circumstances and a superior parenting ability, we affirm the district court's decision to modify the legal-custody provisions of the parties' dissolution decree.

### B.    Physical Care

Having affirmed modification of legal custody to sole legal custody in favor of Miyoko, we need not address the court's modification away from joint physical care, as such an arrangement is only authorized when coupled with joint legal custody.    *See* Iowa Code § 598.41(5)(a); *In re Marriage of Gensley*, 777 N.W.2d 705, 717 n. 7 (Iowa Ct. App. 2009).

### C.    Trial Attorney Fees

At trial, Miyoko requested an award of trial attorney fees in the amount of $3000.[4]  In its ruling, the court granted her an award of attorney fees in the amount of $2000.  Thomas argues the court abused its discretion, highlighting the parties' similar incomes and his support obligation and simply asserting he "had no ability to pay Miyoko's attorney fees."  In response, Miyoko highlights her status as the prevailing party and Thomas's greater income.

Iowa Code section 598.36 authorizes an award of attorney fees to a prevailing party in a modification proceeding "in an amount deemed reasonable by the court."  This statute "gives the district court considerable discretion in determining whether the district court should award such fees." *In re Marriage of Maher*, 596 N.W.2d 561, 568 (Iowa 1999).  In modification proceedings, "[w]hether attorney fees should be awarded depends on the respective abilities of the parties to pay," and "the fees must be fair and reasonable."  *Guyer*, 522 N.W.2d at 822. But, "[t]o overturn the award, [Thomas] must establish that the trial court abused its discretion." *Id.*

---

[4] She testified she incurred $10,000 in fees through trial.

On our review, we are unable to conclude Thomas has met that burden. Miyoko was the prevailing party in the district court, which is a major factor supporting the district court's decision to enter an award.  *See In re Marriage of McCurnin*, 681 N.W.2d 322, 332 (Iowa 2004) ("Because Jennifer was successful as to her application to modify the dissolution decree . . . , she is entitled to trial and appellate attorney fees.").  Thomas also has the higher income, albeit slightly, and there is nothing in the record supporting his argument that he is unable to pay. The court also reduced Miyoko's request by one-third.

Finding Thomas has not demonstrated an abuse of discretion, we affirm the award of trial attorney fees.

### D.    Appellate Attorney Fees

Both parties request an award of appellate attorney fees.  Because Thomas is not the prevailing party on appeal, he does not qualify for an award.  *See* Iowa Code § 598.36.  Miyoko, as the prevailing party, does qualify for an award, and her request for an award of $3960 is accompanied by an itemization.

Our discretion to award attorney fees on appeal is similar to that of the district court.  *In re Marriage of Michael*, 839 N.W.2d 630, 639 (Iowa 2013).  We consider "the parties' respective abilities to pay," "whether a party resisting the [appeal] was successful, and whether a party has been obliged to defend the trial court's decision on appeal."  *Id.*  The parties have comparable abilities to pay, but Miyoko is the prevailing party and was obligated to defend the trial court's decision. Exercising our discretion, we award Miyoko appellate attorney fees in the amount of $2000.  Costs on appeal are taxed to Thomas.

**IV.      Conclusion**

We affirm the district court's decision in its entirety, and we award Miyoko appellate attorney fees in the amount of $2000.  Costs on appeal are taxed to Thomas.

**AFFIRMED**