# IN THE COURT OF APPEALS OF IOWA

No. 24-0430
Filed November 13, 2024

**CATHERINE SMITH,**
     Petitioner-Appellee,

**vs.**

**CHAD RAGAN,**
     Respondent-Appellant.

_____

     Appeal from the Iowa District Court for Muscatine County, Stuart P. Werling, Judge.

     A father appeals a custody order, seeking joint physical care or more visitation. **AFFIRMED AS MODIFIED.**

     Wendy S. Meyer of Lane & Waterman LLP, Davenport, for appellant.

     Esther J. Dean, Muscatine, for appellee.

     Considered by Tabor, C.J., and Chicchelly and Sandy, JJ.

**TABOR, Chief Judge.**

Seven-year-old T.R. is lucky in many ways. His parents, Catherine Smith and Chad Ragan, are devoted caregivers. Both have confidence in the other's parenting skills. T.R. is doing well in school and for over three years has thrived under the shared-care arrangement implemented by his unmarried parents. The question today is whether the district court erred in denying Ragan's request to continue that arrangement and, instead, placing physical care with Smith—a decision based on the parents' communication difficulties and Ragan's unusual work schedule.

In our de novo review, we agree with the district court's assessment that it is in T.R.'s best interests to have a more predictable schedule than he has navigated under his parents' shared-care arrangement. But because the parents agree that T.R. would benefit from more time with his father, we modify the custody order to expand Ragan's parenting time.

## I.       Facts and Prior Proceedings

Smith and Ragan lived together for almost five years but never married. They separated in November 2020. They have one son, T.R., who will be eight years old in November 2024. Smith has two older children, ages nine and eleven, who live with her. T.R. is Ragan's only child.

Smith works as a dialysis technician at a local clinic and is studying to be a registered nurse. She earns $21 per hour and had an annual income of about $43,680 in 2023. Ragan is employed at Harsco Metals where he works a "swing" shift. He explained that one week he works a forty-eight-hour week and the next

week he works a thirty-six-hour week.[1]  Ragan offered his 2024 work schedule as an exhibit.  In his brief he describes his schedule as "consistent but unusual," following the same pattern every four weeks.

> On week one: Monday, Tuesday, Friday, Saturday, and Sunday on the day shift; week two: Wednesday and Thursday on the day shift; week three: Monday, Tuesday, Friday, Saturday, and Sunday on the night shift; week four: Wednesday and Thursday on the night shift.

He also testified that he sometimes has the chance to work extra hours to cover vacations and other circumstances for coworkers.  He earns $28 per hour.  He also serves in the National Guard, requiring him to attend drills one weekend per month.  His annual income is nearly $64,000 from both employment sources.

Since their separation, the parents have worked well together in raising T.R.  Neither parent expressed worries about the other's caretaking abilities.  And while Smith was more comfortable doing pick-ups and drop-offs at the police station where there are cameras, she testified that she had no safety concerns with the visitation exchanges.

In August 2023, Smith petitioned to establish custody, visitation, and child support.  She asked the court to grant joint custody and assign physical care to her.  By contrast, Ragan asked for joint physical care.  In February 2024, the district court held a hearing; Smith and Ragan were the only witnesses.  The day after the hearing, the district court issued its ruling, granting physical care to Smith with "reasonable and liberal visitation" for Ragan.  *See* Iowa Code § 600B.40 (2023).

---

[1] Ragan estimates that his weekly hours are generally between thirty and thirty-six.  The weeks with fewer hours occur when his company has no work on his scheduled shift and sends him home with four hours of pay for the day.

That visitation included parenting time for Ragan every other weekend and midweek visits every other Wednesday.

Ragan appeals the custody order, arguing that the district court erred in not awarding joint physical care. As a fallback position, he contends that his visitation should be increased.

## II. Scope and Standard of Review

The district court tries custody matters in equity, and we review equitable proceedings de novo. Iowa R. App. P. 6.907. We examine the entire record and decide anew the factual and legal issues that the parties preserved and presented for review. *See In re Marriage of Williams*, 589 N.W.2d 759, 761 (Iowa Ct. App. 1998). While our review is de novo, we defer to the district court's factual findings and credibility assessments. *In re Marriage of Gensley*, 777 N.W.2d 705, 713 (Iowa Ct. App. 2009). We do so because that court has a chance to listen to the parties and watch them in person. *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984).

## III. Analysis

### A. Physical Care

Ragan argues that the district court should have granted his request for joint physical care. When a court awards joint physical care, both parents have "rights and responsibilities toward the child including but not limited to shared parenting time with the child, maintaining homes for the child, providing routine care for the child and . . . neither parent has physical care rights superior to those of the other parent." Iowa Code § 598.1(4).

In determining physical care, our "first and governing consideration" is T.R.'s best interests. *See* Iowa R. App. P. 6.904(3)(n). Because Smith and Ragan were not married, we operate under Iowa Code chapter 600B rather than chapter 598 on dissolutions. But we apply the same legal framework to custody and visitation matters involving unmarried parents as we do to those issues arising between parents who had been married to each other. *See* Iowa Code § 600B.40(2) (cross-referencing section 598.41).[2]

Smith sought sole physical care of T.R., while Ragan asked for joint physical care. In denying Ragan's request for joint care, the court cited "the communication difficulties between the parents" and Ragan's "uncertain and uneven work schedule." *See* Iowa Code § 598.41(5)(a). Ragan claims the record does not support those findings. We disagree. As for the first finding, Smith testified that she and Ragan had "poor" communication but that she was trying to improve their information exchanges. Ragan had a somewhat more positive view of their co-parenting abilities. But he agreed that there had been "a serious lack of communication over the last nine months." When read as a whole, the record supports the court's finding that the parties had trouble communicating.

The court's second finding—citing Ragan's unusual work schedule as a reason for denying joint care—presents a thornier dilemma. The court gave a

---

[2] That framework appears in section 598.41(3). *See In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007) (paraphrasing nonexclusive factors as "suitability of parents, whether psychological and emotional needs and development of child will suffer from lack of contact with and attention from both parents, quality of parental communication, the previous pattern of caregiving, each parent's support of the other, wishes of the child, agreement of the parents, geographic proximity, and safety"); *see also In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974) (listing similar circumstances to consider).

shorthand description of Ragan's schedule: "[Ragan] works a job where he has a swing shift, sometimes working days for two weeks and sometimes working nights. He also is a member of the National Guard and regularly serves significant time being called to duty." That finding is a flashpoint for Ragan. He insists that his work schedule has not harmed T.R. and should not be used against him in denying joint physical care. He acknowledges that his work schedule "may be more complicated than 9 to 5 employment," but he maintains that it is "consistent" and "predictable." He notes that it is the same schedule that "the parties have dealt with since November 2020." According to his appellant's brief, the parents "basically share T.R.'s time around [Ragan]'s work schedule."

In her appellee's brief, Smith expresses unease about the effect of Ragan's schedule on T.R.'s stability. She testified that Ragan typically works "two weeks days and then swings to nights and inconsistent days. . . . It ranges from three or four days one week and two days the next." Smith believes that "such a schedule makes it hard to plan things especially since [Ragan] expects to have visitation with T.R. each time that he is off work . . . ." In his reply brief, Ragan claps back: "With a year's worth of advance notice, [Smith] surely is able to plan anything she needs to or wants for T.R."

But the record belies Ragan's claim that his work schedule has been "consistent" and "predictable." Smith testified that each week, Ragan would "send a text message about what the schedule is, what days he's working, and he would want to pick [T.R.] up the night before his day off and keep him until the following day." And Ragan acknowledged that his weekly schedule often varied. He testified: "Sometimes it doesn't happen until I clock out at work and notice the

schedule change. At the top of our weekly schedule, it says, 'Subject to change at a moment's notice,' and that has always been true since working there in 2011." He also described covering for coworkers who had health problems or other leave. He testified: "I believe in the past that has been a problem, but it can be addressed if that's her request. . . . If she's adamant about maintaining a very stable schedule, she'll have one." When asked if he would stop covering for coworkers to achieve more predictable interactions with T.R., Ragan offered this prickly response: "If that would make communication between myself and Ms. Smith better, I am willing to sacrifice that thousands of dollars, yes."[3]

We appreciate that Ragan has cited several cases in which our court decided that one parent's irregular work schedule does not preclude the award of joint physical care. *See In re Marriage of Berning,* 745 N.W.2d 90, 94 (Iowa Ct. App. 2007) (explaining father's swing schedule "may be untraditional" but was "relatively stable" and provided son with "a substantial amount of time with his father"); *see also Dirks v. Eccles*, No. 19-0994, 2020 WL 2071116, at *3 (Iowa Ct. App. Apr. 29, 2020) (describing father's overnight work schedule as "manageable"); *In re Marriage of Killian*, No. 13-1504, 2014 WL 3748304, at *2 (Iowa Ct. App. July 30, 2014) (noting that father's obligation to work every weekend meant he could not have equal time with the children, but under these unique facts those work hours still favored joint physical care); *In re Marriage of Jabens*, No. 10-1071, 2011 WL 441696, at *4 (Iowa Ct. App. Feb. 9, 2011) (acknowledging father's

---

[3] Ragan maintains that the family's income depended on him working "this somewhat erratic schedule." He points to Smith's testimony agreeing that it was "just something that the two of [them] had to put up with."

work schedule "may be untraditional, but it is known far in advance and thus relatively stable"); *In re Marriage of Kelly*, No. 05-1852, 2006 WL 1896312, at *3 (Iowa Ct. App. July 12, 2006) (declining to order shared care, but clarifying that father's work schedule did not, standing alone, disqualify him from exercising physical care).[4] And we agree with that guiding principle.

But that principle does not answer the practical question of how Smith and Ragan can manage a shared-care arrangement going forward. The trial record reveals that Ragan's swing shifts—though known in advance—are subject to change on short notice. The parties' make-shift shared-care arrangement only worked because Smith would allow T.R. to visit Ragan whenever he had a day off work—and often with little lead time.

On appeal, Ragan asserts that he and Smith "maintained a 2-2-3 schedule." In his brief he included this description: "Chad would have care of TR 2 days, Catherine would have care of TR 2 days, and Chad would have care of TR 3 days. Then the schedule would flip so Catherine had care of TR 2 days, Chad had 2 days, and Catherine had 3 days." But he cites nothing in the record to support his assertion. *See* Iowa R. App. P. 6.904(4)(a)(1) (requiring briefs to "contain a citation to the record for each material statement of fact"). And we find no evidence that the parents followed that shared-care arrangement. In fact, given both parents'

---

[4] We have upheld the denial of joint physical care when the district court weighed the parents' work schedules as one factor in its decision. *See In re Marriage of Heiar*, 954 N.W.2d 464, 472 (Iowa Ct. App. 2020).

descriptions of Ragan's varying work shifts, it seems implausible that they could have reliably divided T.R.'s care that way.[5]

What the record does show is that Smith—who was frustrated by being unable to plan family activities given Ragan's unpredictable parenting time—suggested "a 50/50 . . . proposal for a week-one, week-two rotating schedule." But Ragan said, "that was not going to work for him." She then suggested a "week-on, week-off" arrangement. But he also rejected that proposal and offered no practical suggestions as a compromise.

From this impasse, we return to the factors governing decisions whether to award joint physical care. Stability and continuity are prime factors. *See Hansen*, 733 N.W.2d at 696; *see also Winter*, 223 N.W.2d at 166 (considering the emotional needs of the child). The parents debate which physical care arrangement gives T.R. more stability and continuity while best meeting his emotional needs. Ragan insists that his irregular schedule has not harmed T.R., highlighting Smith's testimony that, at worst, the child asked every day who was picking him up from school. What would harm T.R., in Ragan's view, would be spending less time with him.

But in our de novo review, we find this exchange between Smith and her counsel holds the key to deciding what is in T.R.'s best interests:

> Q. So this kind of a schedule really bounces the child around and is pretty chaotic; is that correct?
> A. Yes.

---

[5] Ragan's claim of a two-day, two-day, three-day rotation seems to conflict with Smith's testimony that either she or her daycare provider regularly drop T.R. off at school.

True, counsel introduced the word "chaotic" into the conversation. But Smith endorsed that description of the shared-care arrangement that the parents followed to accommodate Ragan's work. Like the district court, we find that it was in T.R.'s best interests to award physical care to Smith, who has been the parent providing the continuity of care and ensuring stability in T.R.'s life. Even if "bouncing" around has not bothered T.R. in his preschool and early elementary years, when he has not engaged in any extracurricular activities, it is likely to be more disruptive as his academic and social demands increase. Structure and routine are important in a child's life. And a shared-care arrangement with no predictability would place an undue burden on T.R., especially during the school year. So we affirm the award of physical care to Smith.

## B. Visitation

At the same time, Ragan has an important role to play in T.R.'s life. *See Hansen*, 733 N.W.2d at 701–02. No one questions his devotion to T.R. and the child's need for his father's guidance and support. *Id.* Ragan has been an active father, and T.R. will benefit from having the maximum opportunity to continue their physical and emotional contact. *See* Iowa Code § 598.41(1)(a). On this record, we agree with Ragan that the district court should have granted him more parenting time with T.R.

Indeed, even Smith believes that Ragan should enjoy more liberal visitation. But she suggests that he "can expand his visitation by working with and communicating with [her] in order to do that. The court does not need to be involved in that process." In our view, her solution is unworkable—especially

considering her observation that communication between her and Ragan is already poor.

Yet when we search for a better solution in Ragan's briefing, we come up short. He "requests expanded visitation to allow for his continued involvement with T.R. as close to approximating the 2-2-3 rotation schedule the couple was exercising prior to the court order." As noted above, we don't find support in the record for Ragan's claim that the parents followed that rotation. But we do see that Smith recommended that Ragan have more midweek overnight visits with T.R. Building on that recommendation, we order Ragan's midweek visitations to extend from Wednesday after school to Friday morning. And we expand his weekend visitations from Friday night until Monday morning. That expansion will allow Ragan four more overnights each month.

Because Ragan's yearly visitation under the modified order will not exceed the 128 days necessary to receive extraordinary visitation credit under Iowa Court Rule 9.9, the court will not need to recalculate Ragan's child support obligation.

**AFFIRMED AS MODIFIED.**