**IN THE COURT OF APPEALS OF IOWA**

No. 24-0090
Filed February 5, 2025

**IN RE THE MARRIAGE OF EMMA VIERS**
**AND SHAWN VIERS**

**Upon the Petition of**
**EMMA VIERS,**
        Petitioner-Appellee,

**And Concerning**
**SHAWN VIERS,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Linn County, Lars G. Anderson,

Judge.


        An ex-husband appeals from a dissolution decree granting the ex-wife sole

legal custody and physical care of a minor child. **AFFIRMED AND REMANDED**

**TO DETERMINE ATTORNEY FEES.**


        Alexander S. Momany of Howes Law Firm, P.C., Cedar Rapids, for

appellant.

        Justin D. Riem of Arenson Law Group, P.C., Cedar Rapids, for appellee.


        Considered by Schumacher, P.J., and Buller and Langholz, JJ.

**BULLER, Judge.**

Shawn Viers appeals from the decree dissolving his marriage to Emma Viers, which granted her sole legal custody and physical care of their minor child. The district court found Shawn had domestically abused Emma during the marriage. Shawn contests both legal custody and physical care, and Emma asks for appellate attorney fees. We affirm and order Shawn to pay Emma's reasonable attorney fees in an amount not to exceed $7500, as determined by the district court on remand.

## I.       Background Facts and Proceedings

Shawn started dating Emma in 2008, when he was thirty and she was nineteen. They moved in together soon after they started dating and eventually married in 2015. And they had a child in 2017.

In early 2021, Emma petitioned for relief from domestic abuse perpetrated by Shawn. The domestic-abuse court found Shawn had committed domestic abuse, entered an order of protection, and granted Emma care of the child and Shawn visitation.[1] Although Emma recounted abuse throughout the relationship, the event leading to the petition involved Shawn getting angry when she asked him

---

[1] The parties discussed the underlying Iowa Code chapter 236 (2021) proceeding at length, and it is clear the district court considered it in ruling on this matter. But the parties did not formally request the court to take judicial notice of the file, nor did they file portions of it as exhibits or pleadings in the dissolution case. The underlying chapter 236 case is not part of our record on appeal. *See* Iowa R. App. P. 6.801. We consider only information from that case to the extent it was addressed in this matter by testimony or by incorporation of any findings in the dissolution decree. We note a best practice for future litigants would be to judicially notice the file or submit pertinent pleadings as exhibits.

not to spoil the plot of a television show and he started "choking"[2] her in the kitchen and threatened to "kill" her after she called the police. Her roommate did not see any physical violence that night but did hear Shawn tell Emma, after the police arrived: "If you say another fucking word I will fucking kill you." Shortly after this, Emma petitioned for divorce. She sought sole legal custody and physical care of their child, and Shawn requested joint legal custody and that he receive physical care. Neither party sought shared care.

In these divorce proceedings, Shawn continued to deny physical violence against Emma, and he presented testimony from his mother, his girlfriend, and two friends he played games with to essentially establish he was a good parent. He somewhat begrudgingly admitted to yelling at Emma, having heated arguments, and saying things he shouldn't have said. And his own mother agreed there were "not really" any concerns about Emma's parenting. He also pointed toward instances of dishonesty in Emma's past, including one for which she received a deferred judgment that was later expunged.

Emma, consistent with her report in the domestic-abuse case, testified that Shawn "isolated" her from her family and was verbally, financially, emotionally, and physically abusive. She also presented testimony from her roommate, a friend, and her mother that at least partially corroborated her and Shawn's volatile,

---

[2] "Choking" is the word Emma used, but we recognize "strangle" is probably the more accurate verb. *See* Mary Pat Gunderson, *Gender and the Language of Judicial Opinion Writing*, 21 Geo. J. Gender & L. 1, 11 (2019) (on how language matters and noting that describing acts of strangulation as "choking" can minimize or mitigate).

unhealthy relationship—such as detailing Shawn's controlling behavior, Emma's visible injuries, and destroyed property and broken furniture.

The parties disputed the division of childcare and domestic labor during the marriage. One of the few points of agreement was that Shawn never took the child to a doctor's appointment, despite his claim he provided most of her care. In any event, after the temporary-matters hearing, Emma was the primary caregiver. She and the child lived in a one-story house with Emma's roommate, who was also a friend. Emma worked overnights part of the week at a youth shelter and was in school working toward her master's degree with the goal of becoming a mental-health therapist. Her parents help with childcare and pick-up and drop-off from school while Emma is working nights or sleeping. Emma estimated she works about 5% of the time the child is awake, and she believed the child enjoyed spending time with her grandparents. As far as marital finances, Emma testified—without any real dispute from Shawn—that he did not work during the marriage and focused on pursuits like board and video games while Emma covered all their expenses.

Emma also reported the child had repeated disparaging comments Shawn made about how "her mom doesn't love her anymore, that her dad is her only family." The child repeated similar remarks to Emma's mother. In contrast, Emma testified she tried to support the child's relationship with Shawn. Shawn denied disparaging Emma: "Honestly, we don't talk about Emma at all when [the child] is at the house."

The district court found the "marriage was volatile, that [Shawn and Emma] communicate rarely and poorly, and that they do not trust or like each other." The

court explicitly found there was "clear and convincing" evidence that Shawn had domestically abused Emma, based on a finding that Emma "credibly testified" to the physical abuse and that her witnesses corroborating aspects of her testimony were also "credible." The court did not find Shawn's witnesses unbelievable but instead concluded they offered limited insight into the domestic relationship. And the court found Shawn's testimony "not credible" in at least some respects.

The court ordered sole legal custody of the child be placed with Emma based on the parties' inability to effectively communicate or co-parent, their "toxic" relationship, and the evidence of domestic abuse. The court placed physical care with Emma for many of the same reasons, as well as her role as primary caregiver since the parties' separation and the child thriving in that arrangement. The court granted Shawn visitation and rejected Emma's request to restrict or eliminate Shawn's Wednesday overnights, reasoning that Shawn and the child appeared to have a good relationship and no violence had been directed at the child.

Shawn appeals.

## II. Standard of Review

Our review in dissolution cases is de novo. *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007). We give weight to the district court's factual findings, particularly regarding the credibility of witnesses, but we are not bound by them. *Id.*

## III. Discussion

In dissolving a marriage with minor children, the district court must assign sole or joint legal custody. *In re Marriage of Gensley*, 777 N.W.2d 705, 713 (Iowa Ct. App. 2009). "Legal custody" grants the parent (or parents) certain rights and

responsibilities, including but not limited to "decision making affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction." Iowa Code § 598.1(5) (2023); *see Gensley*, 777 N.W.2d at 713. The child's best interests are the primary consideration. Iowa R. App. P. 6.904(3)(n). The district court should, if reasonable and in those best interests, ensure the children have maximum physical and emotional contact with both parents. Iowa Code § 598.41(1)(a). The Code and our case law set forth a lengthy list of non-exclusive factors to guide custody decisions. *Id.* § 598.41(3); *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974) (listing often-overlapping considerations for evaluating custody and physical care).

Among the statutory factors, the district must consider "[w]hether a history of domestic abuse . . . exists." Iowa Code § 598.41(3)(j). The court must consider the surrounding facts and circumstances, including whether a petition for relief was filed, whether a protective order was entered, the response of peace officers to the scene of any alleged abuse, and whether an arrest or conviction resulted. *Id.* "[I]f the court finds that a history of domestic abuse exists, a rebuttable presumption against the awarding of joint custody exists." *Id.* § 598.41(1)(b).

Here, the district court explicitly found a history of domestic abuse, and that finding was grounded in credibility findings we give weight to on appeal. *See* Iowa R. App. P. 6.904(3)(g). That said, even if we did not have explicit credibility findings to rely on, our review of the cold record also would incline us to credit Emma's reports of physical abuse in light of the corroborating witness testimony and undisputed testimony from even Shawn's witnesses on the tenor of the relationship. Shawn thus faces the uphill climb of rebutting the presumption

against joint legal custody. *See* Iowa Code § 598.41(1)(b)*.* He only seeks joint—not sole—legal custody on appeal.

Shawn argues the district court's decree "was almost exclusively shadowed by the alleged history of domestic abuse in this case." He seizes on the district court's language that the domestic abuse "overrides" the other statutory factors. We are mindful that it's easy for us (or lawyers) to armchair-quarterback inartful turns of phrase by the district court from the comfort of appellate review. While the district court's phraseology could have perhaps been better, we think the decree soundly captures the court's finding that Shawn did not overcome the rebuttable presumption established by the General Assembly in Iowa Code section 598.41(1)(b). As proof the district court did not go awry in its analysis, the ruling explicitly considered the parties' inability to communicate, their "toxic" relationship, their dislike—if not hatred—for one another, and their lack of trust and support. These are all textbook-proper considerations in assessing legal custody. *See id.* § 598.41(3). And the court made express findings that these traits and behaviors by the parents "would negatively impact their ability to serve as joint legal custodians for [the child]," which tracks the requirements imposed on the court by section 598.41(2)(b). We thus agree with the district court that the parties' inability to coparent and their toxic relationship "rise[s] above the usual acrimony that accompanies a divorce," and this too weighs against joint legal custody—supporting, rather than rebutting, the statutory presumption against Shawn as a domestic abuser. *See Gensley*, 777 N.W.2d at 715 (quotation marks and citation omitted).

According to Shawn's appellate brief, the temporary-matters order maintaining joint legal custody also weighs in favor of reversing the district court. We are not persuaded. By their very nature, temporary-matters orders consider a limited universe of information and cannot delve into the merits as effectively as a final decree. *See* Iowa Code §§ 598.10, .11. We think it is not unusual that a temporary order would maintain the joint-legal-custody status quo. And we have recognized before a temporary order "create[s] no presumption that parent is the preferred parent in a final custody decision." *In re Marriage of Swenka*, 576 N.W.2d 615, 617 (Iowa Ct. App. 1998). However, we do find it informative that, after the temporary order maintained joint legal custody, these parents remained unable to effectively coparent or communicate, even while both likely realized (or already knew) the disputed issues at trial.

In his reply brief, Shawn stakes out the position that an "award of sole legal custody to one parent is all but tantamount to a termination of the other parent's rights." This is a false comparison, and we reject it. Unlike a termination of parental rights, a custody decree can be modified. *See In re K.L.*, No. 22-0003, 2022 WL 951102, at *1 (Iowa Ct. App. Mar. 30, 2022). And even without legal custody, Shawn has substantial court-ordered visitation—while a terminated parent would have none. Although we understand Shawn is frustrated with the outcome of this dissolution, unfair or exaggerated comparisons are unhelpful.

Shawn also contests the physical-care determination. Because we have affirmed the decree placing sole legal custody with Emma, it follows that physical care of the child also remain with her, subject to visitation granted Shawn by the district court. *See* Iowa Code § 598.41(5) (limiting joint physical care to cases with

joint legal custody); *In re Marriage of Anderson*, No. 23-1224, 2024 WL 4615622, at *6 (Iowa Ct. App. Oct. 30, 2024) ("[A] parent without legal custody of a child cannot be awarded physical care.").

Last, Emma seeks appellate attorney fees in the amount of "at least $7,500." "An award of attorney fees on appeal is not a matter of right, but rests within the court's discretion and the parties' financial position." *In re Marriage of Gonzalez*, 561 N.W.2d 94, 99 (Iowa Ct. App. 1997). In making this determination, we consider the needs of the requesting party for an award of fees, the ability of the other party to pay attorney fees, and whether the requesting party had to defend the trial court's decision on appeal. *In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013). Unfortunately, Emma's attorney did not file a fee affidavit with our court, so we have no way of evaluating whether her request is reasonable. *See In re Marriage of Samuels*, ___ N.W.3d ___, ___, 2024 WL 4370049, at *5 (Iowa Ct. App. 2024) (on our strong preference for attorneys to file fee affidavits). In our discretion, we order Shawn to pay Emma's appellate attorney fees in a reasonable amount not to exceed $7500, determined by the district court upon review of an attorney-fee affidavit and any other information the court believes necessary to determine a reasonable amount.

**AFFIRMED AND REMANDED TO DETERMINE ATTORNEY FEES.**

Langholz, J., concurs; Schumacher, P.J., partially dissenting.

**SCHUMACHER, Judge** (concurring in part and dissenting in part).

I am pleased to join in the well-reasoned majority opinion concerning the award of legal custody and physical care. I dissent only as to the majority's determination that Shawn should contribute to Emma's appellate attorney fees.

"Appellate attorney fees are not a matter of right, but rather rest in this court's sound discretion." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005); *see also Worth v. Geinitz*, No. 23-1080, 2024 WL 2316657, at *3 (Iowa Ct. App. May 22, 2024) ("The attorney fees permitted under [Iowa Code] section 600B.26 [(2023)] include appellate attorney fees."). In considering whether to award such fees we consider the needs of the party seeking the award, the financial ability of the other party to pay, and the merits of the appeal. *Id.*

With this instruction in mind, I address each of the three prongs of the test. As for the first and second prongs, the incomes of both parties to this appeal are relevant. Both parties are employed full-time. The district court determined that Emma's yearly income is $33,280. She works as a youth service worker. Shawn works as a daycare teacher, and the court determined his yearly income to be $29,224. Neither party contests the incomes set by the district court on appeal, and Shawn's child-support obligation was set using these figures. Further, neither party received assets of substantial value in the decree. The dissolution decree required each party to pay their own trial attorney fees. Given the respective incomes, both parties will likely struggle to pay their appellate attorney fees, and both appear to lack the ability to contribute to other parties' appellate attorney fees.

As to the third element, we look to the merits of the appeal. Shawn's appeal was narrow and limited to the issue of legal custody and physical care of the

parties' only child. This prong is in Emma's favor as we are affirming the district court legal custody and physical care award in this appeal. Yet given the economic factors and respective incomes of the parties, each party should pay their respective appellate attorney fees. Accordingly, I concur in part and dissent in part.